## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Dryer, et al. | |
| Plaintiffs, | **CASE NO.** 0:09-CV-02182-PAM-AJB |
| v. | |
| National Football League, | |
| Defendant. | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## AND DEMAND FOR JURY TRIAL

Plaintiffs John Frederick Dryer, James Lawrence Marshall, Joseph Michael Senser, Elvin Lamont Bethea, Dante Anthony Pastorini, Edward Alvin White, Fred Lee Barnett, Tracy Anthony Simien and Darrell Alexander Thompson ("Plaintiffs") on behalf of themselves and all others similarly situated, by and through Interim Class Counsel, for this Consolidated Amended Class Action Complaint against Defendant National Football League ("NFL"), state as follows:

### NATURE OF ACTION

1.     Plaintiffs are retired[1] NFL football players.  Plaintiffs bring this class action on behalf of themselves and all retired NFL players similarly situated who have suffered injury as a result of Defendant NFL's unauthorized use of their identities, including but not limited to their names, images, symbols, and likenesses, to promote the NFL, sell

---

[1] For purposes of this Complaint, "retired" NFL player includes anyone who was ever listed on an NFL roster. These players may also be referred to as "former" NFL players.

NFL-related products, and otherwise generate revenue for the NFL and/or its member teams.

2.     For years, Defendant has earned substantial revenue by making promotional films and selling products featuring the identities of retired NFL football players, including Plaintiffs.  Defendant trades on the "glory days" of the NFL as a marketing and advertising technique to convey authenticity, enhance the NFL's brand awareness and increase its revenue.  The retired players who created these glory days, however, have gone almost completely uncompensated for this use of their identities.  Notably, while exploiting the identities of retired players for commercial gain, the NFL prohibits retired NFL players from using their own identities as players to promote themselves commercially.

3.     Many of the retired players the NFL uses to promote itself struggle with severe physical disabilities as a result of their playing days.  The players incurred these injuries by engaging in the performances the NFL now uses to advertise itself and make money.  Many of these players played at a time when salaries were modest and are now struggling financially while the NFL reaps record-breaking revenues.  The fact now-retired players played for such modest salaries contributed directly to the NFL's ability to grow into the multi-billion dollar entity it has become.

4.     Defendant's commercial exploitation of retired players is not only prolific - it is blatant.  One need look no further than Defendant's NFL Films website to see the names of over 450 retired players being used to advertise and sell videos promoting the NFL.

5.     Defendant's conduct has violated, and continues to violate, Plaintiffs' rights of publicity and other statutory and common laws.   As a result of these violations, Plaintiffs now bring this class action seeking compensation for Defendant's past unauthorized use of the identities of retired NFL football players and to stop this egregious misconduct going forward.

## PARTIES

### Plaintiffs

6.     Plaintiff John Frederick "Fred" Dryer ("Dryer") is a retired NFL football player.  Dryer played defensive end for thirteen seasons in the NFL for two professional teams.  He played for the New York Giants from 1969-1971 and for the Los Angeles Rams from 1972-1981.  Dryer was a dominant defensive football player, recording over 100 quarterback sacks (and many more prior to 1982 when sacks were first recorded as a statistic) and scored two safeties in one game, the all-time NFL record.  Dryer attended San Diego State University where he was also a prolific college football player.  Dryer was an All-American, a first round NFL draft pick, and is a member of the College Football Hall of Fame and San Diego State University Hall of Fame.  After his football career, Dryer became an internationally famous television and film actor and was the star of several television programs, most notably "Hunter".  In 2003, the retired NFL player members of NFL Alumni awarded Dryer the Career Achievement Award.  Dryer is a resident of the State of California, currently residing in Los Angeles, California.  The NFL has used, uses, and threatens to use in the future, Dryer's name, image, symbol, and/or likeness for its own commercial benefit without authorization.

7.     Plaintiff James Lawrence "Jim" Marshall ("Marshall") is a retired NFL football player. Marshall played defensive end for twenty seasons, nineteen of them with the Minnesota Vikings. As a seventeen-year captain of the Vikings, Marshall was a famed member of the "Purple People Eaters". Marshall is one of the best defensive ends ever to play the game, and holds the all-time NFL record for career fumble recoveries. Marshall played in two Pro Bowls and four Super Bowls with the Minnesota Vikings. Prior to playing in the NFL, Marshall starred for the Ohio State University. Further, starting in his NFL playing days, Marshall has been prolifically involved in charity and community outreach programs. In 1975, he helped create a community-based program called "Christmas for Kids". Marshall has devoted his time to countless charities and community efforts, including the Special Olympics, Courage Center, Phyllis Wheatley Community Center, Ronald McDonald House, United Way, Children's Miracle Network and numerous others. As a professional outside of football, Marshall has been a registered stock broker, insurance agent, securities agent, sports commentator and the owner of several businesses. Marshall co-founded and is the former Director of Development and Public Relations for Life's Missing Link, a non-profit organization dedicated to helping inner-city youth realize their potential and avoiding drug and gang activity. Marshall is a resident of St. Louis Park, Minnesota. The NFL has used, uses, and threatens to use in the future, Marshall's name, image, symbol, and/or likeness for its own commercial benefit without authorization.

8.     Plaintiff Joseph Michael "Joe" Senser ("Senser") is a retired NFL football player. Senser played tight end for the Minnesota Vikings from 1979-1984, reaching the

Pro Bowl following the 1981 season. Senser attended West Chester University, where he starred in both football and basketball, and once held the NCAA basketball record for field goal percentage. Following his playing career, Senser has been involved in numerous charitable activities and is a successful businessman, owning a chain of popular sports-themed restaurants in the State of Minnesota. Senser was also a television football commentator, covering the Minnesota Vikings from 1993-94 and 2001-06. Since 2001, Senser has been a member of the Board of Managers for the Milton Hershey School in Hershey, Pennsylvania, a school he attended and which is dedicated to educating children in social and financial need. Senser is a resident of Edina, Minnesota. The NFL has used, uses, and threatens to use in the future, Senser's name, image, symbol, and/or likeness for its own commercial benefit without authorization.

9.     Plaintiff Elvin Lamont Bethea ("Bethea") is a retired NFL football player. Bethea is a member of the Pro Football Hall of Fame (Class of 2003). –Bethea played sixteen seasons at defensive end, all for the Houston Oilers. Bethea is considered one of the best defensive ends ever to play the game, making the Pro Bowl eight times and being named First Team All-Pro once, Second Team All-Pro four times, First Team All-AFC four times, and Second Team All-AFC four times. After retiring from the game, the Houston Oilers retired Bethea's number 65. In college, Bethea starred for North Carolina A&T State University and is the only player from that school ever to be elected to the Pro Football Hall of Fame. Bethea is also a member of the North Carolina Hall of Fame and is the author of "Smash-Mouth: My Football Journey from Trenton to Canton." Bethea resides in Houston, Texas. The NFL has used, uses, and threatens to use in the future,

Bethea's name, image, symbol, and/or likeness for its own commercial benefit without authorization.

10.    Plaintiff Dante Anthony "Dan" Pastorini ("Pastorini") is a retired NFL football player.  Pastorini played quarterback for thirteen seasons in the NFL for four professional teams.  He played from 1971-79 with the Houston Oilers, in 1980 for the Oakland Raiders, in 1981 for the Los Angeles Rams, and from 1982-83 for the Philadelphia Eagles.  As a player, Pastorini was regarded as one of the toughest in the NFL - playing with broken ribs and even a punctured lung.  Pastorini was a Pro Bowl selection in 1975 with the Houston Oilers and a member of the 1981 Oakland Raiders' Super Bowl championship team.   Before playing in the NFL, Pastorini starred at quarterback for Santa Clara University and was the third overall selection in the 1971 NFL Draft.  The NFL has used, uses, and threatens to use in the future, Pastorini's name, image, symbol, and/or likeness for its own commercial benefit without authorization.

11.    Plaintiff Edward Alvin "Ed" White ("White") is a retired NFL football player.   White played offensive guard for seventeen seasons in the NFL for two professional teams.  He played for the Minnesota Vikings from 1969-1977 and for the San Diego Chargers from 1978-1985.  During his career, White was considered one of the top offensive linemen in the game and played in four Pro Bowls and four Super Bowls with the Minnesota Vikings.  White once played nearly an entire season with the Minnesota Vikings with an undiagnosed broken neck and to this day cannot turn his head past the front of either shoulder as a result of the injury.   White is a graduate of the University of California- Berkeley, where he graduated from the School of

Environmental Design and majored in landscape architecture. He also played college football and was a consensus All-American in 1968 and is a member of the College Football Hall of Fame. White played for Indio High School and the school's football stadium was later named "Ed White Stadium". In his post-NFL career, White is an active advocate for retired players. He is also an accomplished artist and sculptor and is the Executive Director of the Oak Lake Art Center, a therapeutic art center for persons suffering from physical, mental, and emotional trauma. White resides in Julian, California. The NFL has used, uses, and threatens to use in the future, White's name, image, symbol, and/or likeness for its own commercial benefit without authorization.

12.   Plaintiff Fred Lee Barnett ("Barnett") is a retired NFL football player. Barnett played wide receiver for eight seasons in the NFL for two professional teams. He played for the Philadelphia Eagles from 1990-95 and for the Miami Dolphins from 1996-97. Barnett attended Arkansas State University, where he starred for the football team, eventually becoming a third-round pick in the NFL. Barnett was a Pro Bowl selection in 1992. In 1994, Barnett's teammates voted to give him the Ed Block Courage Award recipient for his dedication to humanitarian efforts. Barnett is a resident of Philadelphia, Pennsylvania. The NFL has used, uses, and threatens to use in the future, Barnett's name, image, symbol, and/or likeness for its own commercial benefit without authorization.

13.   Plaintiff Tracy Anthony Simien ("Simien") is a retired NFL football player. Mr. Simien played linebacker for nine seasons in the NFL, with the Pittsburgh Steelers, Kansas City Chiefs, and San Diego Chargers. Mr. Simien also attended Texas Christian University, where he starred for the football team. Mr. Simien is a resident of Sweeny,

Texas. Mr. Simien started 89 NFL games and played on three AFC West Division Champion teams for the Kansas City Chiefs.

14.    Plaintiff Darrell Alexander Thompson ("Thompson") is a retired NFL football player. Thompson was a running back for five seasons in the NFL. He played for the Green Bay Packers from 1990-1994. Thompson was a first round draft pick from the University of Minnesota, where he was the school's all time leader in rushing yards. Thompson is currently an analyst for WCCO Radio, covering the University of Minnesota Gophers. During and after his NFL career, Thompson serves as Executive Director at Bolder Options, a mentorship program designed to use biking and running to promote positive behavior in first time offenders aged 10-15.   Thompson resides in the state of Minnesota. The NFL has used, uses, , and threatens to use in the future, Thompson's name, image, symbol, and/or likeness for its own commercial benefit without authorization.

*Defendant*

15.    Defendant NFL is a tax-exempt association under 18 U.S.C. § 501(c)(6) with its headquarters located at 280 Park Avenue, New York, NY 10017. The NFL as a company operates several business wings through which it, in part, carried out the misconduct described herein.   These include, but are not limited to the NFL itself and doing business as NFL Properties, both located at 280 Park Avenue, New York, NY 10017; NFL Enterprises, also located at 280 Park Avenue, New York, NY 10017; NFL Films, located at 1 NFL Plaza, Mount Laurel, NJ 08054; and NFL Network, located at 10950 Wash Boulevard, Culver City, CA, 90232.   Each of these business divisions

operates under the exclusive control of the NFL itself. The NFL is one of the largest entertainment entities in the world with 2008 revenue totaling an estimated $6.9 billion.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over the present action pursuant to 28 U.S.C. § 1331 because this action arises under the Lanham Act, 15 U.S.C. § 1525. The Court has jurisdiction over Plaintiffs' state and common law claims under 28 U.S.C. § 1967 because those claims are so related to the federal claims that they form part of the same case or controversy. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d) because one or more Class members is a citizen of a state different than the state of Defendant's citizenship, there are more than 100 class members, and, on information and belief, the aggregate amount in controversy exceeds the jurisdictional amount of $5 million.

17.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because proposed class representatives reside in Minnesota, certain putative class members reside in Minnesota, the causes of action for the class representatives arise, in part, in Minnesota, the causes of action for class representatives and certain putative class members arise, in part, in Minnesota, and the NFL transacts business within Minnesota.

## FACTUAL BACKGROUND

### *The NFL's Use of Retired Players' Identities to Earn Revenue*

18.    The NFL's past is a key part of Defendant's present marketing and revenue-generation efforts.

19.    One of the key ways the NFL markets itself is by using its NFL Films division to trade on its past to sell products, enhance its present brand and generate revenue.

20.    The NFL also markets itself by trading on the past of retired NFL players to sell products, enhance its present brand and generate revenue.

21.    NFL Films is the commercial filmmaking wing of the NFL and specializes in creating commercial and promotional films highlighting the NFL's past and featuring retired NFL players as the stars.

22.    According to NFL Films' own website, its explicit "function" is, "To *promote the National Football League* and preserve its history for generations of future fans.  To show the game, the passion and the visceral nature of the game from a player's perspective."  (emphasis added).  NFL Films, "launch[ed] pro football into the motion picture business."

23.    *Sports Illustrated* has called NFL Films, "the most effective propaganda organ in the history of corporate America."  The New York Times has said that NFL Films "has grown for nearly four decades into one of the great movie studios in the country…While Dreamworks or Warner puts out more blockbusters, NFL Films is as innovative as any of them."  Filmmaker John Frankenheimer said of NFL Films, "What NFL Films has done for me is to make me emotionally involved with teams I never cared about.  Even if it's a team I never heard of, I can't turn it off."

24.    The NFL Films' website further touts the promotional mission of its films:

Unforgettable images.  Raw emotion.  Epic struggles.  Often, these moments only come across on the big screen: part of a screenplay, performed by actors on a Hollywood back lot.  NFL Films creates these same moments without re-takes, scripts or sets... just world-renowned filmmakers fusing the visceral world of pro football and the romance of celluloid.

A super slow-motion sequence of a quarterback launching a spiral through a gray November sky.  A receiver in full stride leaps to make a mid-air catch.  A defender pulls him to the ground and brings the scene to an abrupt end.  The play happens instantly.  The moments last a lifetime.

Stunning cinematography.  Exclusive all-access sound.  Stirring orchestral music.  Poignant storytelling.  These hallmarks define the NFL Films style... often imitated but never equaled.

NFL Films['] productions aren't just seen, they're felt.

25.    Of course, the nameless "quarterback," "receiver," and "defender" NFL Films describes as starring in its promotional, revenue-generating films are not nameless. They are retired NFL Players and Defendant uses their names, images, symbols, and likenesses in its films to promote itself, sell products, and make money.

26.    One NFL team owner, Robert Kraft of the New England Patriots, explained the commercial value of NFL Films: "The film library, the asset base that's there, the programming...it's sort of like Beatles music or Beethoven's symphonies or Brahms. When you and I aren't here anymore, people will still love to watch it because of the quality of it and the uniqueness and the appeal."

27.    NFL Films productions are not broadcasts, re-broadcasts, or basic accounts of NFL games. As the NFL makes clear, "Full game prints are not available from NFL Films or any other source.  It is impossible to obtain a copy of an entire NFL game." Rather, NFL Films' productions are promotional film productions with scripts, music,

11

editing, direction and production completely independent of the play and production of the games themselves. The NFL makes this distinction clear. Rather than simply showing game footage, "NFL Films goes back and looks at the story of the game. NFL Films is interested in the struggle, not the strategy of the game. Through editing, music and writing, NFL Films gives fans a perspective of the game that perhaps they were not aware of when they watched the broadcast on network television."

28.     The NFL disseminates the works of its NFL Films division several ways. By way of example only, the NFL broadcasts NFL Films features on its own NFL Network, and for years has licensed productions to cable television stations such as ESPN, ESPN Classic, HBO, and major non-cable networks. The NFL also sells NFL Films movies directly to consumers in catalogs, over the Internet, and at retail outlets.

29.     The NFL has realized substantial revenues from NFL Films, including but not limited to fees paid by networks to air the films, revenue from advertisements run during the broadcast of the films, sales of the films as individual products, and from the revenue generated by the realized promotional effect of the films on the NFL's brand and marketability.

30.     Using its NFL Network alone, the NFL broadcasts "hundreds of hours" of NFL Films productions and other programming featuring retired NFL players each year. As the NFL describes it, "As a year-round channel, NFL Network will draw heavily on the resources of NFL Films and its new 200,000 square foot television and film studio complex as well as its immense film library to produce hundreds of hours of original and classic programming including, *NFL Films Presents* and *NFL Films Presents – Game of*

*the Week in HD, Playbook, College Football Sunday, Football America, Point After*, and *Film Session*." "With more than 100 million feet of film in its library, NFL Films is the backbone of NFL Network."

31.   The NFL also sells hundreds of different NFL Films productions directly to consumers, nationally and internationally, at retail outlets, in catalogs and over the Internet at www.nflfilms.com, www.nflshop.com and through Warner Home Video at www.profootballdvd.com.   In addition to selling NFL Films, the NFL licenses NFL Films and the identities of retired NFL Players for numerous other commercial purposes.

32.   The NFL Films' website, for example, currently offers hundreds of productions available for purchase for $50 each.   The NFL uses the names of specific retired NFL players to promote many of the films for sale.   On the "Special Order Catalog" portion of the NFL Films website alone, the NFL uses the specific names of over 450 retired NFL players to promote and sell NFL Films' productions.   The NFL uses the names, images, symbols, and likenesses of these, and of hundreds more, retired NFL players on the packaging, advertising, and sales descriptions of other NFL Films' productions and products available elsewhere.

33.   For example, the NFL sells an entire line of NFL Films' productions under the heading "History".   This includes films for sale such as "The Fabulous Fifties, Volume II".   The NFL's sales description for this film states, "Includes Bobby Layne, the 'Alley Oop' pass, Ollie Matson, Dallas Texans/Baltimore Colts." Other films include, "NFL's Greatest Moments of the Last 25 Years", and "Sensational 60's", for which the

sales description reads, "Bucky Pope, Greg Cook, Joe Namath, George Halas, and Don Meredith."

34.     Another series of videos sold on the NFL Films' website is called "This is the NFL". The NFL's sales description of "Show #5" in this series specifically uses Plaintiff Dryer's name, stating: "Football by the Numbers, Blocking Back, Fred Dryer, Steve Largent, Ground Game Leaders (Falcons, Bears)". Thus, the NFL specifically uses Plaintiff Dryer's name and identity in its sales description, on its sales website, to promote and sell copies of its NFL Films.

35.     The NFL uses Plaintiff Marshall's identity in a similar way. For instance, on its NFL Films' website, the NFL sells a promotional video called "Mavericks & Misfits." The sales description for this product reads, "See football's most unique personalities and free spirits – players like Fran Tarkenton and Jim Marshall to coaches like the Redskins' George Allen – who did things their way and won." In another series of videos sold to promote the 1986 NFL season, the NFL sells Show #1 of the series using the sales description, "Players to Watch, Trends for '86, Steve's Trends for '86, Jim Marshall, LA Raiders/Denver Broncos, Buddy Ryan." As with Plaintiff Dryer, the NFL specifically uses Plaintiff Marshall's name and identity to sell its NFL Films' products and to promote the NFL.

36.     NFL Films' productions feature far more players than the 450-plus specifically named on the NFL Films' website to sell products. For example, the NFL uses Plaintiff White's name, image and likeness in several videos highlighting the four

Super Bowls he played in with the Minnesota Vikings in 1970 (Super Bowl IV), 1974 (Super Bowl VIII), 1975 (Super Bowl IX), and 1977 (Super Bowl XI).

37.    The NFL has also used Plaintiff White's name, image and likeness in connection with his involvement in one of the most famous NFL games of all time. White was a member of the San Diego Chargers when they defeated the Miami Dolphins in the playoffs on January 2, 1982.  That game yielded one of the most iconic images in NFL history when Chargers tight end Kellen Winslow was helped from the field by teammates following the victory. After the game, White was interviewed on the field and recounted the magnitude of the victory. The NFL has repeatedly used White's identity in connection with publicizing this famous game to promote the league.

38.    As a Hall of Famer, the NFL has used Plaintiff Elvin Bethea's name, image and likeness numerous times to market the league and generate revenue.  For example, currently on www.nfl.com, consumers may find an "Elvin Bethea Through the Years" photo gallery, as well as his name used to promote the 50th Anniversary of the AFL. The NFL has also featured Bethea's identity in the film, "NFL Pro Football Hall of Fame: 85 Years of Greatness."

39.    The NFL has also used the name, image, and likeness of Plaintiff Dan Pastorini to promote the NFL in several NFL Films productions.  One such film, the *Championship Chase*, discusses the 1974 NFL season and features, among several other notable games that season, Pastorini's last-second touchdown pass to beat the Cleveland Browns in Houston's last game of the season.

40.     In addition to television broadcast and video sales, the NFL pervasively uses the Internet to broadcast and feature NFL Films' productions containing the names, images, and likenesses of retired players on its website and on affiliated websites. For example, www.nfl.com currently contains, in the "NFL Video" portion of the site, an NFL Films' production titled, "Top Ten Gutsiest Performances: Dan Pastorini". The NFL website describes this production as, "Dan Pastorini plays with cracked ribs and becomes the first QB to play wearing a flak jacket." According to data on the website, as of the date of the filing of *Dryer et al., v. NFL* (D. Minn.) Complaint (filed August 20, 2009), over 13,900 persons have viewed the video featuring the name, image and likeness of Plaintiff Pastorini.

41.     Congress has taken note of the NFL's use of NFL players' identities for promotional purposes.   In 2008, Congresswoman Linda Sanchez of California held a congressional hearing to receive testimony and analyze the widely-reported physical and economic plight of retired NFL players.  Her findings illustrated the dire situation many NFL alumni face, while the NFL continues to use their likenesses to generate revenue.

42.     Congresswoman Sanchez found that, "half of all players retire because of injury, sixty percent of players suffer a concussion, at least one quarter of players suffer multiple concussions and nearly two-thirds suffer an injury serious enough to sideline them for at least half of a football season." She also found, "The evidence suggests that the vast majority of [retired] players needing [health] benefits do not receive them.  What is even more troubling is that *through projects such as NFL Films, the NFL continues to profit off those very same players* who are denied benefits." (emphasis added).

43.    The NFL has disseminated, and to this day disseminates, NFL Films and other utilizations of the identities of Plaintiffs and members of the Class in all fifty states and around the world on multiple television stations, including but not limited to, the NFL Network, ESPN, ESPN Classic, and HBO, and via the Internet.  The NFL has earned substantial revenue from these uses of Plaintiffs' identities and has caused damage to Plaintiffs and members of the Class in all of those jurisdictions.

44.    On information and belief, the NFL has sold, and to this day sells, NFL Films' productions and other utilizations of the identities of Plaintiffs and members of the Class to all fifty states and around the world.  The NFL has therefore caused damage to Plaintiffs and members of the Class in all of those jurisdictions.

45.    The NFL has used the names, images, symbols, and/or likenesses of Plaintiffs and members of the Class commercially on the Internet to promote the NFL's brand, to sell products, and to otherwise increase the NFL's revenue as an independent entity and on behalf of its thirty-two member clubs.

46.    All Plaintiffs and members of the Class whom the NFL has used to generate revenue are readily identifiable because they are portrayed by name, image, uniform, number, likeness, symbol, and/or other unique indicia.  In addition, on information and belief, the NFL has digitized its entire NFL Films' library and archives so that Plaintiffs and class members may be searched for and isolated by year, game, team, and/or player name.

***Plaintiffs' Publicity Rights Are Extremely Valuable***

47.     The NFL is eminently aware of the extremely high value of the names, images, symbols, and likenesses of its players and takes extreme measures to restrict access and dissemination of NFL player footage and images in any form.  For instance, the NFL restricts media, including local news outlets, to showing only 45 seconds per day of footage of NFL players shot in any fashion at league or team facilities.  This includes *non-playing* situations such as news conferences, interviews and practice-field reports.  If a media outlet shows any footage on its website, the NFL requires the outlet to provide links to both www.nfl.com and to the player's NFL team's website.  The NFL bars non-affiliated media outlets from selling any Internet advertising connected to the presentation of NFL player footage on non-NFL affiliated websites.

48.     The NFL's restrictions of player images and footage is not limited only to current players.  If a media outlet, such as a local news station, wishes to use footage of retired players as part of reporting the news, it must pay the NFL steep fees.

49.     The NFL also prohibits retired NFL players from using their own names, images, likenesses, symbols, and other indicia of identity as players to promote themselves commercially or otherwise profit.   If, for example, a player attempts/attempted to promote himself or his business by showing footage of himself as a player, the NFL would immediately order him to cease.  Of course, the NFL does, in certain circumstances, allow such promotional uses by retired players, but only if a player pays the NFL exorbitant sums for the right to do so.  Even then, the player is at the mercy

of the NFL, which maintains the ability to withdraw its permission at any time, for any reason or for no reason at all.

50.     The NFL's intent in restricting public access to the names, images and identities of its players is to drive fans and revenue to NFL owned and affiliated outlets to view NFL' images, footage and programming.  As one team spokesman, the Washington Redskins' Chris Helein, informed the Washington Post, "There are a number of reasons for [barring videographers], but it's basically a content issue[.]  I won't hide . . . the fact that the NFL and everything that surrounds it is valuable content".

51.     NFL spokesman Greg Aiello further confirmed the substantial *commercial* value of footage of NFL players – wholly apart from the historical or newsworthy value of any broadcast of NFL games.  According to Aiello, the NFL restricts media access to players because:

> We're trying to balance protection of our business assets with the equally important need to receive extensive news media coverage and communicate with as many fans as possible on a regular basis.  We have no interest in controlling or limiting what news Web sites do, except limiting the use of video that undermines our own Internet operations. We have important business interests on the Internet, and we have to be careful about that.

52.     It is in part because of this extremely high value that the NFL created its own NFL Network in 2003 to drive and capture fans seeking programming related to professional football.  As the NFL describes it, "NFL Network is a melting pot of gridiron greats from the NFL's past, present and future that will sate the voracious appetites of millions of football fans across the country."

53.    Further evidence of the great value of NFL players' likenesses is found in the standard player contract for NFL players.  Beginning in 1993, the NFL began requiring active player contracts to include clauses granting the NFL the authority to use the players' names, images, and likenesses to publicize and promote the NFL.  Of course, any such assignments do not apply to retired players, since their player contracts are, by definition, no longer in force.

54.    By commercializing the names, images, and likenesses of its players, both active and retired, the NFL has become one of the largest entertainment conglomerates on the planet, raking in an estimated $6.9 billion in 2008, and estimated revenue of 9.3 billion in 2010.

55.    The NFL did not begin earning billions of dollars in revenue overnight.  It began earning revenue gradually over many years with the support and sacrifice of the players who played the game.  Those retired NFL players, as a group, suffer severe physical maladies and disabilities as a result of the sacrifices they made to make the NFL what it is today.  Many retired players played before the era of multi-million dollar contracts or played only a few seasons and are struggling financially while the League they helped build reaps record breaking revenue.  There is thus an *overwhelming* interest in compensating these players for the commercial use of their names, images, symbols, and likenesses by the NFL.

56.    By their present Complaint, Plaintiffs and members of the Class seek nothing more than to obtain their fair share of the revenues the NFL has earned, presently earns, and will earn, by the NFL's use of the retired players' identities.  Plaintiffs

therefore bring this action to provide long-awaited redress for the players that made and continue to make professional football the most popular sport in America.

## CLASS ACTION ALLEGATIONS

57.     Plaintiffs reallege all previous paragraphs as if fully stated herein.

58.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to all applicable provisions of Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

59.     The Proposed Class which Plaintiffs seek to represent is composed of:

> All persons who played professional football for any NFL     member team, who are retired or no longer active, and whose name,     voice, image, likeness, or other indicia of identity has been used by the NFL to promote the NFL or any of its member teams, sell products or services, or otherwise to increase the brand awareness or obtain revenue for the NFL or any of its member teams.

60.     Alternatively, should it be found that any of Plaintiffs' state law claims could not be certified on a national basis, Plaintiffs seek statewide subclasses (or groups of statewide subclasses) for these same persons.

61.     Plaintiffs specifically exclude from the Class the NFL and any related entities; all subsidiaries or affiliates of the NFL; any entity in which the NFL has a controlling interest; and any and all of the NFL's employees, affiliates, legal representatives, heirs, successors or assignees.

62.     Plaintiffs also specifically exclude from the Class the Judge and Magistrate assigned to this case and any member of their immediate families.

63.     As shown below, this class action satisfies all requirements under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, including but not limited to the elements commonly referred to as numerosity, commonality, typicality, adequacy and superiority.

a. **Numerosity.**   Consistent with Rule 23(a)(1) of the Federal Rules of Civil Procedure, the proposed Class "is so numerous that joinder of all members is impracticable." On information and belief, based on information obtained from news reports in the public media and investigation of counsel, the number of members of the proposed Class is believed to exceed 10,000.

b. **Commonality.**   Consistent with Rule 23(a)(2) of the Federal Rules of Civil Procedure, the proposed Class shares "common questions of law or fact." Defendant has engaged in a common course of misconduct toward Plaintiffs and members of the proposed Class, including but not limited to using Plaintiffs' names, images, symbols, and likenesses to promote the NFL commercially and to sell NFL-related products. This common course of misconduct, resultant injury to Plaintiffs and the members of the Class, and the remedies available to all such persons demonstrate the propriety of class certification.

c. **Typicality.**   Consistent with Rule 23(a)(3) of the Federal Rules of Civil Procedure, the claims of the proposed Class Representatives, "are typical of the claims ... of the class." Plaintiffs and all members of the proposed Class who have had their identities used by the NFL for commercial or promotional purposes have suffered damages as a result of the NFL's wrongful acts and misconduct. The Named Plaintiffs'

factual and legal claims arise out of the same uniform misconduct perpetrated by Defendant in a similar manner against both Plaintiffs and members of the Class. Thus, the evidence and legal theories underlying Plaintiffs' claims are identical to those underlying the claims of all members of the putative Class.

d. **Adequacy**. Consistent with Rule 23(a)(4) of the Federal Rules of Civil Procedure, Plaintiffs "will fairly and adequately protect the interests of the class." Plaintiffs have no adverse or conflicting interests to the proposed Class members. The Court has appointed Bob Stein LLC, Hausfeld LLP, and Zimmerman Reed, P.L.L.P., as Interim Lead Class Counsel who are competent counsel experienced in complex, class action litigation and who possess the necessary financial resources to adequately and vigorously litigate this class action.

64. **Predominance**. Consistent with Rule 23(b)(3) of the Federal Rules of Civil Procedure, common questions of law and fact predominate over individual issues. Common questions include but are not limited to the following:

- Did the NFL use Plaintiffs' identities?

- Did the NFL use Plaintiffs' names, images, symbols, and/or likeness for its advantage or economic gain?

- Did the NFL have Plaintiffs' consent to use Plaintiffs' names, images, symbols, and/or likenesses commercially for economic gain?

- Are Plaintiffs and the Class entitled to relief for False Endorsement under § 43(a)(1)(A) of the Lanham Act?

- Are Plaintiffs and the Class entitled to relief under Minnesota laws protecting rights of publicity?

- Are Plaintiffs and the Class entitled to relief under California statutory right of publicity laws?

- Are Plaintiffs and the Class entitled to relief under California common law protecting rights of publicity?

- Are Plaintiffs and the Class entitled to relief under Texas common law protecting rights of publicity?

- Are Plaintiffs and the Class entitled to relief under Arizona common law protecting rights of publicity?

- Are Plaintiffs and the Class entitled to relief under other state common and statutory law protecting rights of publicity?

- Are Plaintiffs' claims barred in whole or in part by any of Defendant's affirmative defenses?

- Did Plaintiffs suffer damage as a result of the NFL's use of their names, images, symbols, and/or likenesses?

65.    **Superiority.** Consistent with Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is a superior method of resolving this action. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for the party opposing the Class and would lead to repetitious trials of the numerous common questions of law and fact. Plaintiffs know of no difficulty of any kind that would make a class action in this case unmanageable.

66.    The Class also satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because, as set forth herein, Defendant has acted and/or refused to act on grounds that apply generally to Plaintiffs and members of the Class, thereby warranting appropriate injunctive and/or declaratory relief respecting the Class as a whole.

67.    Proper and sufficient notice of this action may be provided to the Class members through actual notice to retired NFL players tracked by the NFL, and/or NFL member clubs, among other methods.

68.    Plaintiffs and members of the Class have suffered harm and damages as a result of Defendant's wrongful conduct as alleged herein.  Absent representative action, Plaintiffs and the members of the Class will continue to suffer losses, thereby allowing Defendant's violation of law to proceed without remedy, and allowing Defendant to retain the proceeds of its ill-gotten gains.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (False Endorsement, § 43(a) of the Lanham Act, 15 U.S.C. § 1125)

69.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

70.    § 43(a)(1)(A) of the Lanham Act states:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof..., which-

(A)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

71.    Defendant NFL uses the actual names of retired NFL players on its NFL website to promote the league, and on its NFL Films' website catalog, among other places, to identify and solicit sales of its NFL products.

72.   Defendant NFL also uses the names, images, symbols, and/or likenesses of thousands of retired NFL players in its NFL Films' productions, among other places, for the explicit purpose of promoting the NFL, increasing its brand awareness, and driving revenue to the NFL through product sales and consumer favor of the NFL over competing entertainment options.

73.   The NFL uses the actual names of retired NFL Players in connection with product descriptions and does so for the purpose of advertising and selling specific NFL Films' video and other products.  The NFL also uses the names, images, symbols, and likenesses of Plaintiffs and members of the Class in connection with promoting the NFL as a specific, consumable entertainment product.

74.   The names of the individual retired players the NFL uses to describe, advertise, and sell its products are highly recognizable to persons deciding whether to purchase Defendant's products.  Otherwise, the NFL would not select the individual players it does when promoting itself and its products.

75.   The identities of the retired players the NFL features in its promotional NFL Films and other products are recognizable.  The names, images, and likenesses of all professional athletes are highly recognizable because of the popularity of professional sports.  Professional players also wear uniforms, numbers, and name plates, and/or have readily identifiable movements, statements, or accessories (make-up or attire) making them readily recognizable to consumers.  Further, because NFL Films is a promotional enterprise, the NFL chooses athletes from the most recognizable situations in football's past to promote and endorse the league.

76. The NFL's motivation in producing NFL Films and featuring the names, images, symbols, and/or likenesses of retired NFL players is purely economic. The motivation is to sell NFL products, increase the NFL's brand power by trading on its past, and drive consumers to spend money on the NFL and its member teams instead of other entertainment options.

77. NFL Films does not simply use the names, images, symbols, and likenesses of retired NFL football players, to report the news or for historical pieces; the NFL uses retired players for promotional pieces intended to portray the NFL as an entertainment option, in the most positive light possible. At no point in any NFL Film does anyone criticize the NFL, as they would if it were a standard news or historical piece.

78. NFL Films may not be standard 30-second television advertisements, but they are intended to, designed to, and do serve the same promotional purpose. Similar to "infomercials," NFL Films are intended to focus consumers on the drama and intrigue of the NFL as a consumable entertainment product. Plaintiffs and members of the Class are the uncompensated stars of these promotional films.

79. Plaintiffs and members of the Class have legally protectable rights in their names, images, symbols, and/or likenesses; Plaintiffs and members of the Class own these rights outright. Any assignment of such rights made, for example, in their standard player contracts, expired with the expiration of such contracts.

80. The NFL's use of the names, images, symbols, and/or likenesses of Plaintiffs and members of the Class in its promotional NFL Films' productions and other products is likely to cause confusion or to cause mistake, or to deceive as to the

affiliation, connection, or association of Defendant with Plaintiffs as to the origin, sponsorship, or approval of the goods, services, or commercial activities by Defendant. Needless to say, Plaintiffs do not sponsor or approve of the goods and services for which the NFL is using their names, images, symbols, and/or and likenesses without authorization.

81.     The NFL's use of the names, images, symbols, and/or and likenesses of Plaintiffs and members of the Class in its promotional NFL Films' productions and other products creates actual confusion concerning Plaintiffs' sponsorship or approval of those goods or services.

82.     As a direct and proximate result of Defendant's misconduct, Plaintiffs and members of the Class have suffered injury.

## SECOND CAUSE OF ACTION

### (Appropriation of Right of Publicity, Minnesota Common Law)

83.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

84.     The NFL has made use of, and continues to make use of, the identities of Plaintiffs and members of the Class, including but not limited to their names, images, symbols, and/or and likenesses, to promote the NFL and otherwise obtain revenue.

85.     As a direct and proximate result of the NFL's improper, unauthorized use of their publicity rights, Plaintiffs and members of the Class have suffered injury.

## THIRD CAUSE OF ACTION

### (Violations of Right of Publicity, California Civil Code § 3344)

86.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

87.     The NFL has knowingly and intentionally used, and continues to use, the identities of Plaintiffs and members of the Class, including but not limited to their names, images, symbols, and/or likenesses, to advertise for and promote the NFL and to solicit purchases and sell products with revenue benefiting the NFL and its member organizations.

88.     The NFL has done so without the consent of Plaintiffs and members of the Class.

89.     As a direct and proximate result of the NFL's misappropriation of their publicity rights, Plaintiffs and members of the Class have been injured in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Violations of Right of Publicity, California Common Law)

Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

90.     Pursuant to the conduct described herein, the NFL has utilized and continues to utilize the identities of Plaintiffs and members of the Class, including but not limited to their names, images, symbols, and/or likenesses, without their consent and for the NFL's own advantage, commercial and otherwise.

91.     As a direct and proximate result of the NFL's misappropriation of their publicity rights, Plaintiffs and members of the Class have been injured.

## FIFTH CAUSE OF ACTION

### (Misappropriation of Right of Publicity, Texas Common Law)

92.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

93.     The NFL has appropriated the identities of Plaintiffs and members of the class for the value associated with them and for the NFL's own advantage and benefit.

94.     Plaintiffs and members of the Class are readily identifiable in all uses by the NFL because they are portrayed by name, image, uniform, number, and other indicia.

95.     As a direct and proximate result of the NFL's misappropriation of their publicity rights, Plaintiffs and members of the Class have been injured.

## SIXTH CAUSE OF ACTION

### (Misappropriation of Right of Publicity, Pennsylvania Common Law)

96.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

97.     The NFL has made use and continues to make use of the identities of Plaintiffs and members of the Class, for advertising purposes and for purposes of trade without first having obtained consent.

98.     The NFL has knowingly and intentionally used and continues to use the identities of Plaintiffs and members of the Class, including but not limited to their names, images, and likenesses, to advertise for and promote the NFL and to solicit purchases and sell products with revenue benefiting the NFL and its member organizations.

99.     As a direct and proximate result of the NFL's improper, unauthorized use of their identities, Plaintiffs and members of the Class have suffered injury.

## SEVENTH CAUSE OF ACTION

### (Violations of Pennsylvania Consolidated Statutes
### Title 42 § 8316)

100.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

101.    The NFL has made use and continues to make use of the identities of
Plaintiffs and members of the Class, for advertising purposes and for purposes of trade
without first having obtained written consent.

102.    The NFL has knowingly and intentionally used and continues to use the
identities of Plaintiffs and members of the Class, including but not limited to their names,
images, and likenesses, to advertise for and promote the NFL and to solicit purchases and
sell products with revenue benefiting the NFL and its member organizations.

103.    As a direct and proximate result of the NFL's misappropriation of their
identities, Plaintiffs and members of the Class have been injured in an amount to be
proven at trial, and are entitled to an injunction preventing further violations of their
rights.

## EIGHTH CAUSE OF ACTION

### (Violations of State Right of Publicity Statutory and Common Laws)

104.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

105.    Plaintiffs have been, and continue to be, injured in all fifty states as a result
of the NFL's misappropriation of their rights by use of the Internet, television and by
other means.

106.   In addition to claims under the statutory and common laws of the states in which they reside, Plaintiffs also assert claims under the statutes and common laws of all other states where their rights, and the rights of members of the Class, were violated.

107.   Defendant has violated Arizona common law protecting the right of publicity.

108.   Defendant has violated Alabama common law protecting the right of publicity.

109.   Defendant has violated Connecticut common law protecting the right of publicity.

110.   Defendant has violated Florida Stat. § 540.08.

111.   Defendant has violated Florida common law protecting the right of publicity.

112.   Defendant has violated Georgia common law protecting the right of publicity.

113.   Defendant has violated Hawaii common law protecting the right of publicity.

114.   Defendant has violated Illinois Rev. Stat. ch. 765 § 1075.1 *et seq.*

115.   Defendant has violated Illinois common law protecting the right of publicity.

116.   Defendant has violated Indiana Code § 32-26.

117.   Defendant has violated Kentucky Rev. Stat. §391.170.

118.   Defendant has violated Kentucky common law protecting the right of publicity.

119.   Defendant has violated Massachusetts Gen. Laws Ann. Ch. 214, § 3A.

120.   Defendant has violated Michigan common law protecting the right of publicity.

121.   Defendant has violated Missouri common law protecting the right of publicity.

122.   Defendant has violated Mississippi common law protecting the right of publicity.

123.   Defendant has violated Nebraska Rev. Stat. § 20-202.

124.   Defendant has violated New Jersey common law protecting the right of publicity.

125.   Defendant has violated New York Civil Rights Law § 51.

126.   Defendant has violated North Carolina common law protecting the right of publicity.

127.   Defendant has violated Ohio Rev. Code Ann. § 2741.01 *et seq.*

128.   Defendant has violated Ohio common law protecting the right of publicity.

129.   Defendant has violated Oklahoma Stat. tit. 12, § 1448, 1449.

130.   Defendant has violated Rhode Island Gen. Laws § 9-1-28, 9-1-28.1(a)(2).

131.   Defendant has violated Tennessee Code Ann. § 47-25-1102 *et seq.*

132.   Defendant has violated Texas Property Code § 26.011.

133.   Defendant has violated Utah Code Ann. § 45-3-1 *et seq.*

134.   Defendant has violated Utah common law protecting the right of publicity.

135.   Defendant has violated Virginia Code § 8.01-40.

136.   Defendant has violated Washington Rev. Code § 63.60.010 *et seq.*

137.   Defendant has violated Wisconsin Stat. § 995.50(2)(b).

138.   Defendant has violated Wisconsin common law protecting the right of publicity.

139.   As a direct and proximate result of the NFL's unlawful conduct, Plaintiffs and members of the Class have been injured in each of these states.

## NINTH CAUSE OF ACTION

### (Unjust Enrichment)

140.   Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

141.   Defendant has been unjustly enriched by obtaining money through unlawful means and at the expense of Plaintiffs.

142.   Under common law principles of unjust enrichment, Defendant should not be permitted to retain the benefits conferred by such ill-gotten income.

143.   Plaintiffs seek disgorgement of all of monies Defendant has obtained or derived from the unauthorized use of Plaintiffs' identities for promotional or commercial purposes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief against Defendant as follows:

1.      Certify a plaintiff Class as defined herein;

2.   Appoint Plaintiffs John Frederick Dryer, James Lawrence Marshall, Joseph Michael Senser, Elvin Lamont Bethea, Dante Anthony Pastorini, Edward Alvin White, Fred Lee Barnett, Tracy Anthony Simien and Darrell Alexander Thompson as Class Representatives;

3.   Appoint Plaintiffs' counsel Bob Stein LLC, Hausfeld LLP, and Zimmerman Reed, P.L.L.P. as Lead Class Counsel;

4.   Award Plaintiffs all damages allowed by law;
5.   Award Plaintiffs equitable and injunctive relief as allowed by law;

6.   Grant Plaintiffs declaratory relief as allowed by law;

7.   Award Plaintiffs costs and attorneys' fees against Defendant as allowed by law; and

8.   Grant such other or further relief as allowed by law and as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated:  November 14, 2011

Charles S. Zimmerman MN 120054
J. Gordon Rudd, Jr. MN 222082
Brian C. Gudmundson MN 336695
ZIMMERMAN REED, PLLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
Email:
charles.zimmerman@zimmreed.com
gordon.rudd@zimmreed.com
brian.gudmundson@zimmreed.com

Respectfully submitted,

s/Bob Stein
Robert A. Stein MN 104930
BOB STEIN LLC
10125 Crosstown Circle, #200
Eden Prairie, MN 55344
Telephone: (952) 829-1043
Facsimile: (952) 829-1040
Email: rastein66@aol.com

Daniel E. Gustafson  MN 202241
Jason S. Kilene MN 24773X
David Goodwin MN 386715
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email: dgustafson@gustafsongluek.com


Shawn M. Raiter
LARSON KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6518
Facsimile: (651) 789-4818
Email: sraiter@larsonking.com

Michael D. Hausfeld (pro hac vice)
James J. Pizzirusso (pro hac vice)
HAUSFELD LLP
1700 K Street, NW
Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
mhausfeld@hausfledllp.com

Michael P. Lehmann (pro hac vice)
HAUSFELD LLP
44 Montgomery Street
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeldllp.com
jking@hausfeldllp.com
abailey@hausfeldllp.com

Mark J. Feinberg #28654
Michael E. Jacobs #0309552
Shawn D. Stuckey #0388976
ZELLE HOFMANN VOELBEL &
MASON LLP
500 Washington Avenue, South
Suite 4000
Minneapolis, MN 55415
Telephone: (612) 339-2020
Facsimile: (612) 336-9100
mfeinberg@zelle.com
mjacobs@zelle.com
sstuckey@zelle.com

Daniel S. Mason (pro hac vice)
ZELLE HOFMANN VOELBEL &
MASON LLP
44 Montgomery Street
Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-0700
Facsimile: (415) 693-0770
dmason@zelle.com

Thomas J. Ward
Daniel S. Ward
WARD & WARD, P.L.L.C.
2020 Street, N.W.
Washington, D.C. 20036
Telephone: (202) 331-8160
Facsimile: (202) 503-1455
Email: tom@wardlawdc.com
Email: dan@wardlawdc.com

**ATTORNEYS FOR PLAINTIFFS AND THE CLASS**