UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JOHN FREDERICK DRYER, ET AL.,

        Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE,

        Defendant.

Civil No. 09-2182 PAM/AJB

**MEMORANDUM IN
SUPPORT OF SETTLING
PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL
OF SETTLEMENT AND
PROVISIONAL CLASS
CERTIFICATION**

---

## INTRODUCTION

Plaintiffs' Lead Settlement Counsel submits this memorandum on behalf of the Plaintiffs who have agreed to the Settlement (the "Settling Plaintiffs") and the proposed Class in support of their motion for preliminary approval of Settlement under Federal Rule of Civil Procedure 23(e).

Plaintiffs in this class action allege that Defendant National Football League ("NFL") used their identities as NFL Players after their retirement in violation of their state law rights of publicity, the federal Lanham Act, and other provisions of state law. After more than three years of hard-fought litigation, Settling Plaintiffs and the NFL have reached a settlement, which is memorialized in the Settlement Agreement attached as Exhibit 1 to the Affidavit of Daniel E. Gustafson ("Gustafson Aff.").

The Settlement is intended to resolve all claims that have been or could have been

asserted in this case concerning the use of the identities of NFL Players after their retirement by the NFL. The Settlement, among other things, provides for the NFL to pay fifty million dollars ($50,000,000) in cash, forty-two million dollars ($42,000,000) of which will be paid over eight years into a Common Good Fund for the benefit of Retired Players, subject to the terms of the Settlement Agreement. The Settlement also provides for the establishment and the initial funding of a Licensing Agency, which will license on a non-exclusive basis, on behalf of members of the Class ("Class Members"), certain of their Publicity Rights for commercial purposes in ways that Class Members cannot now license by themselves. The Licensing Agency, therefore, can add to the commercial value of Group Publicity Rights without subtracting from the value of individual rights. The Licensing Agency will be independent from the NFL and the NFL Players Association ("NFLPA").

The proposed Settlement is an excellent result for the proposed Class, given the risks and costs of continued litigation, trial, and potential appeals. Plaintiffs' Lead Settlement Counsel and counsel for the Settling Plaintiffs fully support the Settlement, having concluded that it is fair, reasonable, adequate, and in the best interests of the Settling Plaintiffs and the proposed Class.

Accordingly, Settling Plaintiffs respectfully request that the Court provisionally certify the proposed Class for purposes of settlement; grant preliminary approval of the proposed Settlement; approve the forms of notice and the plan for dissemination of notice; and set a schedule for the final approval process.

# BACKGROUND

## A. FACTUAL BACKGROUND:

Plaintiffs brought this action on behalf of themselves and a proposed Class of:

> All individuals who, prior to the date of the Preliminary Approval Order, were on the roster of any Member Club and who, as of the date of the Preliminary Approval Order, (a) have retired, formally or informally, from playing professional football with the NFL or any Member Club, or (b) were formerly on any roster of any Member Club and are no longer under contract to a Member Club and are not seeking active employment as an NFL Player with any Member Club, (collectively "Retired Players"); and for Retired Players who are deceased, all of their respective heirs, executors, administrators, beneficiaries, successors, and assigns who own or control their Publicity Rights.

See Second Consolidated Amended Complaint at ¶ 74. "Publicity Rights" are defined in the Settlement Agreement. Plaintiffs allege that Defendant's unauthorized use of their and other Class Members' identities to promote the NFL, among other things, violates section 43(a) of the Lanham Act, 15 U.S.C. § 1125, and state statutory and common law publicity rights, and also unjustly enriches the NFL. See Second Consolidated Amended Complaint at ¶¶ 87-97, 98-155, 156-159. Plaintiffs allege that as a direct and proximate cause of Defendant's conduct, Plaintiffs and Class Members suffered injury. See Second Consolidated Amended Complaint at ¶¶ 1, 5, 76, 80, 121.

## B. PROCEDURAL BACKGROUND:

### 1. Complaints:

Certain Plaintiffs filed an action on August 20, 2009, alleging that the use by the NFL of their identities as NFL Players after their retirement violates their state law rights of publicity, the federal Lanham Act, and other provisions of state law. Additional retired

NFL players filed complaints in 2011, and certain Plaintiffs filed a Consolidated Amended Complaint on November 15, 2011. Michael Hausfeld, of Hausfeld LLP, Charles Zimmerman of Zimmerman Reed, PLLP, and Robert Stein of Bob Stein LLC were designated as Interim Co-Lead Counsel by order of the Court on September 13, 2011 (Dkt. 137).

In connection with seeking preliminary approval of the Settlement Agreement, Plaintiffs' Lead Settlement Counsel has filed a Second Consolidated Amended Complaint.

**2.**     **Discovery:**

Although discovery in this case was bifurcated into class and merits phases, Plaintiffs conducted extensive discovery. They sought and obtained the production of more than half a million pages of paper and electronic documents from the NFL. They deposed several NFL executives and additional NFL employees. They conducted an inspection of NFL Films' computer systems. They also sought and received documents from the NFLPA, NFL Players Inc., Playmark Inc., and the NFL Alumni Association.

The NFL also conducted extensive discovery, which included seeking production of documents; review of documents; and taking the depositions of the following eight plaintiffs:  John Frederick Dryer, James Lawrence Marshall, Joseph Michael Senser, Elvin Lamont Bethea, Dante Anthony Pastorini, Fred Lee Barnett, Darrell Alexander Thompson, and Tracy Anthony Simien.

Plaintiffs and the NFL each engaged multiple experts on subjects including advertising and consumer surveys and both sides served initial expert reports related to class issues.

### 3.   Settlement Discussions:

At the outset of the case, United States District Judge Paul A. Magnuson urged the parties to "consider whether the costs of litigation are justified" and suggested that "the Plaintiffs, who profess great concern about their less-fortunate brethren who suffer long-term health consequences of playing in the League, might be willing to forego individual payment for the good of all former players." (*See* Order, Dkt. 35 at 18.)

Consistent with the Court's direction, the parties had numerous in-person and telephonic meetings over a period that spanned several years of litigation in an effort to resolve their serious disagreements about the issues raised in the case.

Since the spring of 2012, Chief Magistrate Judge Arthur J. Boylan has supervised the settlement process and presided over numerous negotiating sessions, including in-person and telephone meetings. During this period, counsel for the Plaintiffs and Defendant held numerous additional meetings in person and by video and telephone conference.  By November of 2012, the parties had discussed various terms for a possible settlement; however, there were several points of contention among the various parties.

On December 12, 2012, Daniel E. Gustafson was appointed Plaintiffs' Lead Settlement Counsel (Order, Dkt. 250). Since that date, pursuant to the Court's Order that "one lawyer . . . act as Lead Settlement Counsel" and that counsel's obligations are not to one client but "to the class as a whole," Plaintiffs' Lead Settlement Counsel has had

repeated telephone conferences and in-person meetings with the NFL. On January 11,

2013, the Court issued a further order directing Plaintiffs' Lead Settlement Counsel to

"continue to attempt to resolve this matter" and to "report directly to and consult with"

the Court (Order, Dkt. 252).

Plaintiffs' Lead Settlement Counsel and counsel for Defendant continued to meet

to discuss the possibility of settlement and continued to update the Court on progress that

had been made by the parties. On February 25, 2013, after Plaintiffs' Lead Settlement

Counsel and counsel for Defendant had notified the Court that they had reached a

settlement in principle and would file a Second Amended Consolidated Complaint as

well as a Motion for Preliminary Approval of the Settlement and Provisional Class

Certification, the Court issued an order directing Plaintiffs' Lead Settlement Counsel to

take "all necessary steps" to do so (Dkt. 256).

### C. **SUMMARY OF THE PRINCIPAL BENEFITS OF THE SETTLEMENT**:

Under the terms of the Settlement, Defendant will pay forty-two million dollars

($42,000,000) over the course of eight years into the Common Good Fund, under the

terms and conditions of the Settlement Agreement. Consistent with this Court's

suggestion at the outset, (See Order, Dkt. 35 at 18), the Common Good Fund will be used

to provide benefits to Retired Players for the purposes described in the Fund Charitable

Uses, as summarized on pages 6-7 and as further defined in the Settlement Agreement.

The NFL will make its first payment, of five million dollars ($5,000,000), into the

Common Good Fund no later than 10 business days after the Common Good Fund

Establishment Date, as defined in the Settlement Agreement. The NFL will make

contributions to the Common Good Fund over a period of eight years, one on each of the eight successive anniversary dates of the Common Good Fund Establishment Date, in the amount set forth in the Settlement Agreement, or under certain limited conditions, directly to support the Fund Charitable Uses.

The total of forty-two million ($42,000,000) in NFL Common Good Fund Contributions is subject to possible deductions by the NFL as follows:  the NFL will be entitled to deduct from the NFL Common Good Fund Contribution made on the sixth anniversary date of the Common Good Fund Establishment Date and from each of the successive NFL Common Good Fund Contributions the amount of all reasonable expenses that any of the NFL Parties has paid to defend, settle, or satisfy the judgment on any Opt Out Claim (as defined in the Settlement Agreement). The total amount that the NFL may deduct for all expenses for all Opt-Out Claims is capped at thirteen million, five hundred thousand dollars ($13,500,000).

Plaintiffs will establish a Common Good Entity to administer the Common Good Fund as set out in the Settlement Agreement. The Common Good Entity will be a not-for-profit entity governed by its own Board of Directors and will be independent of the NFL and the NFLPA. The Common Good Entity will disburse funds from the Common Good Fund for the benefit of Retired Players or other similarly situated individuals to third-party organizations only for the Fund Charitable Uses, which include (1) medical research; (2) short-term and long-term housing; (3) health and dental insurance coverage; (4) medical screening and evaluations; (5) mental health programs; (6) wellness programs; (7) career transition programs, including employment training and support; (8)

any medical costs not covered under a health insurance policy or plan, under the terms of the Settlement Agreement; and (9) other uses as agreed to by the Board of Directors of the Common Good Entity, Plaintiffs' Lead Settlement Counsel and the NFL under the terms of the Settlement Agreement.

The NFL's contributions to the Common Good Fund, overseen by a Board with representatives from among the Class Members, potentially will benefit all Retired Players who are eligible for the support from the organizations supported by the Fund. Plaintiffs' Lead Settlement Counsel and the Settling Plaintiffs concluded that having the NFL contribute to a fund that would potentially benefit all eligible Retired Players is fairer to the entire Settlement Class than making direct payments to individual Class Members. That is because the value of individual Class Member's respective Publicity Rights would have been very difficult to assess and varies widely, creating the possibility of disagreements or conflicts within the Class. In addition, per capita payments would have resulted in low payments to each Class Member.

A second principal benefit of the Settlement Agreement is the creation of a Licensing Agency for the purpose of licensing certain Publicity Rights of Retired Players, on their behalf, for commercial purposes. The Licensing Agency will be independent from the NFL, NFLPA, and all other existing organizations acting on behalf of Retired Players. The Licensing Agency will initially be authorized to license the Group Publicity Rights of Class Members, on their behalf, on a non-exclusive basis, as defined and set forth in the Settlement Agreement. Individual Retired Players may also choose to authorize the Licensing Agency to license their individual Publicity Rights on their

behalf. The NFL will provide money to establish and support the initial operations of the Licensing Agency. In addition, as described in the Settlement Agreement, for the period during which it is making contributions to the Common Good Fund, the NFL will provide substantial, in-kind annual contributions intended to assist the Licensing Agency in its promotional and marketing activities, including by:

a. providing the Licensing Agency with at least one hundred thousand dollars ($100,000) worth of media value for the Licensing Agency's commercials, under the terms of the Settlement Agreement;

b. using reasonable efforts to cause the NFL's licensee for the NFL Shop.com to develop a robust retired NFL players apparel section that will offer jerseys for at least one hundred (100) retired NFL players and actively promote such apparel in conjunction with the NFL;

c. providing the Licensing Agency with access to the NFL Media Center at each Super Bowl;

d. providing access to the Licensing Agency at the Licensing Agency's expense to event space in the host city for each Super Bowl (e.g., a suite at a hotel) for the Licensing Agency to host an event for its clients;

e. providing NFL Game Footage to the Licensing Agency on a royalty-free basis under the terms of the Settlement Agreement for the purposes of advertising the Licensing Agency's services;

f.  providing the Licensing Agency with access to any annual NFL Sponsor Summit and any annual NFL Club Marketing, under the terms of the Settlement Agreement;

g.  providing access to the Licensing Agency at the Licensing Agency's expense to event space in the host city for each Pro Bowl game (if played) for the Licensing Agency to host an event for its clients; and

h.  maintaining a link to the Licensing Agency's website on a historic players' section, or elsewhere, on NFL.com.

The Licensing Agency will, on behalf of Class Members, collect licensing revenues that will then be paid to those Class Members whose Publicity Rights are licensed for commercial purposes.  It also will make contributions on their behalf to the Common Good Fund, all as set forth in the Settlement Agreement.

Both the Licensing Agency and the Common Good Entity will be independent from the NFL and the NFL Players Association ("NFLPA").  The initial Board of Directors of each of them will be appointed by the Court at the time of Preliminary Approval of the Settlement.  At this time, Plaintiffs' Lead Settlement Counsel proposes the following individuals to be on the initial Boards of Directors[1] for both the Licensing Agency and the Common Good Entity:

James Nathaniel Brown
Irvin Acie Cross
Billy Joe Dupree
Ronald Mix

---

[1] Although each of the original Plaintiffs was asked if he wanted to serve on the initial Board of Directors, they each declined.

Darrell Thompson
Jack Youngblood
David Robinson

The forms of the organizational documents for the Licensing Agency and the Common Good Entity are attached as exhibits 5 and 6 to the Settlement Agreement. See Gustafson Aff., Exh. 1. In accordance with those documents, the Boards will be able to retain legal, financial, and business advisors to establish and support the operations of the Licensing Agency and the Common Good Entity.

Pursuant to the terms of the proposed Settlement, the NFL will pay four hundred fifty thousand dollars ($450,000) into an escrow account for the purpose of notice and administration expenses and for initial expenses of the Licensing Agency (up to the amount of fifty thousand dollars ($50,000) and as approved by Plaintiffs' Lead Settlement Counsel and the NFL). If the Court grants Final Approval of the Settlement, the Final Approval Order requires the NFL to pay an additional seven million five hundred fifty thousand dollars ($7,550,000) into the escrow account within ten (10) business days of the Effective Date, which shall be used for the purpose of paying the awards of attorneys' fees and expenses[2] to Settling Plaintiffs' Counsel and Plaintiffs' Lead Settlement Counsel, the payment of any service awards to the Settling Plaintiffs, and, as described above, to defray the costs of establishing and the initial operations of

---

[2] Settling Plaintiffs' Counsel and Plaintiffs' Lead Counsel will be required to petition for fees and expenses and submit detailed time and expense reports following specific guidelines for what will be compensable and what will not. *See* Section D, below. These petitions and supporting documentation will be audited by Plaintiffs' Lead Settlement Counsel, who will then make recommendations to the Court as to the appropriate allocation of attorneys' fees and expenses. The Court or its designee will then make a final determination of the appropriate amount of attorneys' fees and expenses as well as the appropriate allocation amongst Settling Plaintiffs' Counsel and Plaintiffs' Lead Counsel.

the Licensing Agency during the first twenty-four (24) months after the Effective Date.

At the end of the twenty-four (24)-month period, all money remaining in the escrow

account will be transferred to the Common Good Fund.

The Release language in the current Settlement Agreement makes it clear that the

release being given relates only to claims arising out of or related to any uses of publicity

rights of the Released parties that publicize, promote, market, or advertise the NFL, any

Member Clubs, the sport of NFL football, or any NFL football games. It also makes clear

that the Released Claims do not include claims for worker's compensation, personal

injury, pension benefits, or contract claims unrelated to the NFL Players contract.

## ARGUMENT

### A. PROVISIONAL CLASS CERTIFICATION SHOULD BE GRANTED

To qualify for certification, an action must satisfy all of the provisions of Federal

Rule of Civil Procedure 23(a), plus one of the subdivisions of Rule 23(b). Fed. R. Civ. P.

23(a), (b). Rule 23(a) requires the proponents of certification to establish each of the

following: (1) that the members of the proposed class are so numerous that joinder of the

individual claims would be impracticable; (2) that there are questions of law or fact

common to the class; (3) that the claims of the proposed class representatives are typical

of the claims of the class members; and (4) that the proposed class representatives will

adequately represent the interests of the class. Fed. R. Civ. P. 23(a). As relevant here,

Rule 23(b)(3) requires that the common questions of law and fact must predominate over

individual questions, and the class must be superior to other available methods for fairly

and efficiently adjudicating the controversy. *See In re Select Comfort Corp. Sec. Litig.,*

202 F.R.D. 598, 611 (D. Minn. 2001).

### 1.      Numerosity Is Satisfied:

The proposed Class is sufficiently numerous to satisfy Rule 23(a)(1) because there

are many thousands of Class Members. See Second Consolidated Amended Complaint ¶

78(a). For a class action to be appropriate, the proposed class must be so numerous that

joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). Impracticable does

not mean impossible, only difficult or inconvenient to join all members of the Class. *See*

*Lockwood Motors, Inc. v. Gen. Motors Corp.*, 163 F.R.D. 569, 574 (D. Minn. 1995).

Minnesota district courts have determined that putative class sizes of 40 will support a

finding of numerosity. *Id.* The proposed Class far exceeds that threshold.

### 2.      There are Common Questions of Law and Fact:

A common question, for purposes of Rule 23(a)(2), is a "common contention" that

is "of such a nature that it is capable of classwide resolution – which means that

determination of its truth or falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541,

2551 (2011). What matters is "the capacity of a classwide proceeding to generate

common *answers* apt to drive the resolution of the litigation." *Id*. (quoting Nagareda,

Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.Rev. 97, 132 (2009)).

"Rule 23 does not set forth a mere pleading standard," so a party seeking class

certification must "prove that there are *in fact* . . . common questions of law or fact." *Id.*

at 2551. The existence of a single, common question will satisfy Rule 23(a)(2). *Id.* at

2556. Here, Plaintiffs contend there are common questions relating to the scope of the grants of publicity rights to the NFL in the standard player contracts. *See In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 617 (8th Cir. 2011) (The "interpretation of [contractual] warranty and its application to plaintiffs is a common question that lends itself to efficient classwide resolution"). Plaintiffs also contend there are common questions relating to the classification of NFL Films productions as endorsements or promotions, and the application of the First Amendment to the NFL Films productions at issue. *See Karsjens v. Jesson*, 283 F.R.D. 514, 518 (D. Minn. 2012) (holding commonality is satisfied when common questions have common answers that drive case resolution, such as "whether defendants violated plaintiffs' and class members' rights to freedom of expression, speech, and religious exercise as protected by the First Amendment"). These common questions satisfy the requirements of Rule 23(a)(2).

### 3. <u>Plaintiffs' Claims Are Typical of the Class:</u>

The typicality prerequisite is satisfied "when the claims of the named plaintiffs arise from the same event or are based on the same legal theory as the claims of the class members." *Lockwood Motors*, 162 F.R.D. at 575. "When the claims or defenses of the representative and the class are based on the same course of conduct or legal theory, it is thought that the representatives will advance the interest of the class members by advancing his or her own interests." *In re Control Data Corp. Sec. Litig.,* 116 F.R.D. 216, 220 (D. Minn. 1986) (citations omitted). Therefore, it has been held that any differences between the class representative and the putative class must be material to the claims and defenses pled – not merely incidental to the allegations – to defeat typicality. *See*

*Lockwood,* 162 F.R.D. at 575-76. Accordingly, courts have held that the burden of demonstrating typicality is fairly easily met. *DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171, 1174 (8th Cir. 1995).

In this case, the legal claims arise out of the same types of uses of publicity rights by Defendant in a similar manner with respect to Plaintiffs and other Class Members. Thus, with respect to the causes of action alleged, the legal theories underlying Plaintiffs' claims are identical to those underlying the claims of all members of the proposed Class. The claims of all Plaintiffs and Class Members arise from Defendant's allegedly unlawful use of their identities for commercial and promotional purposes and the damages suffered as a result of those wrongful acts. As such, the typicality requirement is satisfied.

### 4. <u>Settling Plaintiffs Have Adequately Represented the Class:</u>

Under Rule 23(a)(4), a class representative must also "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In order to meet this requirement, the Court must find that (1) the representatives and their counsel are able and willing to prosecute the action competently and vigorously and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. *See Lockwood,* 162 F.R.D. at 576.

In this case, the Court appointed Interim Co-Lead Counsel who have vigorously prosecuted this action on behalf of not only the Settling Plaintiffs but also the entire proposed Class. Plaintiffs' Lead Settlement Counsel was then appointed by the Court to represent the Class as a whole in the final settlement negotiations. All of these counsel have demonstrated their willingness to vigorously represent the Class in this action.

Similarly, the Settling Plaintiffs have stepped forward to represent the Class in connection with the proposed Settlement. The claims of the Settling Plaintiffs are sufficiently similar to those of the other members of the proposed Class that it is unlikely that the goals and viewpoints of the Settling Plaintiffs and other Class Members will diverge. The claims of all Class Members stem from Defendant's alleged unlawful use of the Settling Plaintiffs' and other Class Members' names, images, and likenesses for the benefit of the NFL and the injury that they suffered as a result of that conduct. Three of the Settling Plaintiffs – Darrell Thompson, Fred Barnett, and Tracey Simien – have been involved in the case from early on and have been consulted about the Settlement. Similarly, the Plaintiffs added in the Second Consolidated Amended Complaint (although newly serving as class representatives) have been actively following the litigation for many months and have been involved in and been consulted about settlement talks. The proposed Class has been and is adequately represented for purposes of provisionally certifying the Class for settlement.

### 5. Certification Under Fed. R. Civ. P. Rule 23(b)(3):

In addition to Rule 23(a), certifying the proposed Class is appropriate because a class action in this litigation satisfies the requirements of predominance and superiority under Rule 23(b)(3).

#### a. Common Questions of Law and Fact Predominate Over Individual Questions.

A proposed class meets the predominance requirement of Rule 23(b)(3) when "the questions of law or fact common to class members predominate over any questions

affecting only individual members." Fed. R. Civ. P. 23(b)(3); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). This Court has recognized that "[a]s with commonality and typicality requirements, the predominance inquiry is directed toward the issue of liability." *In re Select Comfort*, 202 F.R.D. at 610. When determining whether common questions predominate, courts "focus on the liability issue … and if the liability issue is common to the class, common questions are held to predominate over individual questions." *Id.* (citations omitted). In the context of a proposed settlement class, "a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620 (citation omitted).

In the context of the proposed Settlement, the common questions identified above predominate over individual issues. Here, there are common questions relating to the scope of the grants of publicity rights to the NFL in the standard player contracts, the classification of NFL Films productions as endorsements or promotions, and the application of the First Amendment to the NFL Films productions at issue. The individual issues that could arise at trial regarding the application of the answers to these questions to individual films and individual players, or similar individual issues regarding consent, authorization, or choice of law, are not an impediment to certification in the context of a proposed settlement. *See In re Zurn Pex Plumbing Prod. Liab. Litig.*, 2012 WL 5055810 at *4 (D. Minn. Oct. 18, 2012) (approving class settlement and stating that "individualized claims and defenses need not be adjudicated in order to approve the Settlement and [they] do not predominate").

**b.  A Class Action is Superior to Other Available Methods for Resolving this Controversy.**

Consistent with Fed. R. Civ. P. 23(b)(3), a class action in this case is a superior method for resolving these claims. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for the Defendant in this case and would lead to repetitious trials of the numerous common questions of fact and law.

Settling Plaintiffs have satisfied Rule 23(a) and (b)(3) for purposes of the proposed Settlement, and the Court should provisionally certify the proposed Class.

**B.  <u>PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE.</u>**

As a matter of long standing public policy, settlement is a strongly favored method for resolving disputes. *See Katun Corp. v. Clarke,* 484 F.3d 972, 975 (8th Cir. 2007) ("Minnesota courts recognize a 'strong public policy favoring the settlement of disputed claims without litigation.'") (citations omitted); *Liddell v. Board of Educ. of the City of St. Louis,* 126 F.3d 1049, 1056 (8th Cir. 1997). It is beyond question that there is an overriding public interest in settling litigation, and this is particularly true in class action suits. *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.,* 111-MD-2247 ADM/JJK, 2012 WL 2512750 at *7 (D. Minn. June 29, 2012) ("The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context." (quoting *White v. Nat'l Football League,* 822 F. Supp. 1389, 1416 (D. Minn. 1993)); *Unitarian Universalist Church of Minnetonka v. City of*

*Wayzata,* CIV 10-607 RHK/TNL, 2012 WL 3889121 at *4 (D. Minn. Aug. 31, 2012);

*Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1148 (8th Cir. 1999) ("[S]trong public policy

favors [settlement] agreements, and courts should approach them with a presumption in

their favor.").

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval for

the compromise of claims brought on a class basis. The procedure for review of a

proposed class action settlement is a well-established process. *See* Manual for Complex

Litigation § 13.14 (4th ed. 2007) (hereinafter "*Manual*"). First, the Court conducts a

preliminary hearing to determine whether the proposed settlement falls within the range

of possible judicial approval. 4 Herbert B. Newberg, Newberg on Class Actions, § 11.25

(4th ed. 2002) ("Newberg"). At the Final Approval Hearing, the Court will have before it

extensive papers submitted in support of the proposed Settlement and will be asked to

make a determination as to whether the proposed Settlement is fair, reasonable and

adequate, under all circumstances. At this juncture, Settling Plaintiffs and Defendant

request only that the Court grant preliminary approval of the Settlement.

In determining whether preliminary approval is warranted, the sole issue before

the Court is whether the proposed Settlement is within the range of what might be found

fair, reasonable and adequate, so that notice of the proposed Settlement can be given to

the Class Members and a hearing scheduled to consider Settling Plaintiffs' motion for

final approval of the proposed Settlement. *See, e.g., Xcel Energy, Inc.,* 364 F. Supp. 2d

1005 (D. Minn. 2005); *see also In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 57 (D. Mass

2005) ("First, the [court] reviews the proposal preliminarily to determine whether it is

sufficient to warrant public notice and hearing. If so, the final decision on approval is made after the hearing." (citing *Manual* at 173)).

The Eighth Circuit has established four factors for determining whether a proposed settlement is fair, reasonable and adequate:  (1) the merits of plaintiffs' case, weighed against the terms of the settlement; (2) the defendant's financial conditions; (3) the complexity and expense of further litigation; (4) the amount of opposition to the settlement. *In re UnitedHealth Group Inc.,* 631 F. Supp. 2d at 1156 (D. Minn. 2009) (citing *In re Wireless Tel Fed. Cost Recovery Fees Litig.,* 396 F.3d 922, 932 (8th Cir. 2005)); *see also Van Horn v. Trickey,* 840 F.2d 604 (8th Cir 1988). At the preliminary approval stage, only the first three factors are considered. *In re Wireless Tel.,* 396 F.3d at 932.

A court may also consider procedural fairness to ensure the settlement is not the product of collusion but resulted from arm's length negotiations. *In re UnitedHealth Group Inc.,* 631 F. Supp. 2d at 1156; *In re Wireless,* 396 F.3d at 934; *DeBoer,* 64 F.3d at 1178.

Settling Plaintiffs are now requesting that the Court take the first step in this process and grant preliminary approval of the proposed Settlement. The proposed Settlement clearly satisfies the standard for preliminary approval.

### 1. <u>The Terms of the Proposed Settlement Provide A Substantial Benefit To The Class:</u>

The most important consideration in deciding whether a settlement is fair, reasonable and adequate is "the strength of the case for plaintiffs on the merits, balanced

against the amount offered in settlement." *Petrovic*, 200 F.3d at 1150 (internal quotations omitted); *In re Wireless Tel.,* 396 F.3d at 932-33. The Court "cannot be expected to balance the scales with the nicety of an apothecary. The very object of compromise 'is to avoid the determination of sharply contested and dubious issues.'" *White,* 822 F. Supp. at 1417 (quotation omitted). Thus, the Court's determination generally "will not go beyond 'an amalgam of delicate balancing, gross approximation and rough justice.'" *Id.* (quotation omitted).

Both (1) the establishment of the independent Common Good Entity and the NFL's payments into a Common Good Fund and (2) the creation of an independent Licensing Agency authorized to license Class Members' Group Publicity Rights and Individually Authorized Publicity Rights represent significant benefits to the proposed Class.

Under the Settlement, a Licensing Agency will be established for the purpose of licensing Class Members' Group Publicity Rights and Individually Authorized Publicity Rights for commercial purposes on their behalf. The Licensing Agency will be independent from the NFL, the NFLPA, and all other organizations acting on behalf of Retired Players. It will be governed by a Board of Directors that includes Class Members. The initial Board of Directors will be identified in the Preliminary Approval Order and the Notice sent to Class Members.

Under the Settlement, the Licensing Agency will be authorized by Class Members to market, promote and license their Group Publicity Rights (or it may contract with an established agency to do the same for Class Members) on their behalf on a non-exclusive

basis, as set forth in the Settlement Agreement. At any time, a Class member may withdraw from the Licensing Agency the right to license Group Publicity Rights. A Class member may also authorize the Licensing Agency to license some or all of his Individually Authorized Publicity Rights other than Group Publicity Rights.

The NFL will take steps, as described on pages 9-10 above (and as further set forth in the Settlement Agreement), to assist the Licensing Agency and will contribute financially toward the establishment and initial operations of the Licensing Agency. The NFL also has committed to cooperate with the Licensing Agency when a potential licensee of Class Members' Publicity Rights requests a license from the NFL for intellectual property rights controlled by the NFL. Finally, the NFL will provide assistance to the Licensing Agency to develop an initial database of Class Members.

The Licensing Agency will pay Class Members directly when it licenses their Publicity Rights on their behalf. For the first time, licensees will be able to go to a single entity to license Group Publicity Rights of Retired NFL Players. The Agency also will facilitate the licensing of those Publicity Rights with intellectual property owned by the NFL, such as the NFL logo and NFL copyrights in game footage; the coordination of licensing both of Retired NFL Players' Publicity Rights and of NFL intellectual property has not previously been accomplished through a single entity. The Licensing Agency will measure the extent to which there is demand for the Publicity Rights of Retired NFL Players. To the extent the demand is significant, the Licensing Agency can generate substantial revenues that will directly benefit Class Members. For example, for Group Publicity Rights, after deducting a capped amount to defray the operating expenses of the

Licensing Agency, seventy-five percent (75%) of the royalties from each licensed use will be paid to the Class Members whose Players Identity Elements are used and twenty-five percent (25%) will be contributed by the Licensing Agency on their behalf to the Common Good Fund. The revenue generated for each Class Member will closely match the value of the Class Member's publicity rights – thus providing a good fit between this settlement benefit and the value of each Class Member's claims. The establishment of the Licensing Agency and the assistance from the NFL provides a substantial benefit to Class Members directly linked to the claims being settled.

With respect to the Common Good Fund, the NFL will deposit forty-two million dollars ($42,000,000) over the course of the eight years following the Effective Date. This amount is subject to the right of the NFL, starting in the sixth year, to deduct certain amounts, up to a cap, for expenses associated with Opt-Out Claims.

The Common Good Entity will disburse the NFL's contributions to third-party organizations to be used to benefit Retired Players or other similarly situated individuals and only for the following Fund Charitable Uses: (1) medical research; (2) short-term and long-term housing; (3) health and dental insurance coverage; (4) medical screening and evaluations; (5) mental health programs; (6) wellness programs; (7) career transition programs, including employment training and support; (8) any medical costs not covered under a health insurance policy or plan; and (9) other uses as agreed to by the Board of Directors of the Common Good Entity, Plaintiffs' Lead Settlement Counsel and the NFL under the terms of the Settlement Agreement. This is a substantial benefit to Class Members.

23

2. **Complexity and Expense of Continued Litigation Favor Preliminary Approval:**

Although Settling Plaintiffs brought their case believing it had merit, they have considered the challenges they would face in continuing to litigate. Defendant denies having violated any Plaintiff's rights of publicity and any liability for any alleged damages. Defendant has raised numerous contentions of fact and law with Plaintiffs' case, which are summarized in part in the Settlement Agreement, that it believes provide it with strong defenses, including the substantial delays in bringing the case and that no players had ever claimed, prior to the bringing of this action, that they were entitled to compensation for the post-retirement uses of their images. In addition, the Court has already limited the time period in which claims could be pursued (Memorandum and Order, Dkt. 247 at 8). There are complexities to this action and continued litigation carries substantial risks, including (a) the significant risk and expenses necessary to prosecute Plaintiffs' claims against Defendant to trial and subsequent appeals, and (b) the inherent difficulties and delays that complex litigation entails. Given all of this, Plaintiffs' Lead Settlement Counsel believes that the proposed Settlement represents an excellent result and eliminates the risk that the Class might not otherwise recover any damages if the litigation were to continue. In light of the extraordinary benefits afforded through the proposed Settlement to the proposed Class and to avoid the uncertainties of continued litigation, preliminary approval of the proposed Settlement is appropriate.

This assessment was made on a detailed record. Prior to entering into the Settlement Agreement, Settling Plaintiffs, through their counsel, conducted extensive

class discovery. They obtained more than half a million pages of documents from the Defendant. They deposed several NFL executive and employees, received documents from third parties and consulted with experts.

Plaintiffs' Lead Settlement Counsel, having over twenty years of experience in complex class action litigation and having negotiated several substantial settlements, took all of this into account. He carefully considered and evaluated relevant legal authority and evidence to support the claims asserted against Defendant, the likelihood of prevailing on these claims, the risk, expense and duration of continued litigation, and the appeals and subsequent proceedings that would likely have occurred if Plaintiffs had prevailed against Defendant at trial. Were the litigation to continue, the amount of time and expenses necessary to take this case through trial would be significant, without any assurance that any recovery, let alone one greater than the amount of the benefits provided by the proposed Settlement, could be achieved. A lengthy trial and the inevitable appeals would not serve the interests of the proposed Class, especially in light of the substantial benefits that the proposed Settlement provides for the proposed Class.

Based on this experience and these considerations, Plaintiffs' Lead Settlement Counsel concluded that the Settlement is fair, reasonable, and adequate, and in the best interest of the proposed Class and he has so advised the proposed Class. As this Court has previously held:  "[t]he Court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." *See In re Employee Benefit Plans Sec. Litig.,* No. 3-92-708, 1993 WL 330595, at *5 (D. Minn. June 2, 1993). *See also In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.,* 11-MD-2247

ADM/JJK, 2012 WL 2512750 (D. Minn. June 29, 2012) ("[C]ourts give great weight to and may rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." (quotations omitted)); *Xcel Energy, Inc.,* 364 F. Supp. 2d at 1018.

Moreover, an evaluation of the benefits of a settlement must be tempered by a recognition that any compromise involves concessions on the part of all settling parties. As this Court has noted:  "The Court concludes that, at the time of settlement, there remained significant risk of a null recovery. This risk, balanced against the settlement's substantial recovery, favors approval." *In re UnitedHealth Group Inc. PSLRA Litig.,* 643 F. Supp. 2d 1094, 1099 (D. Minn. 2009). *See also Officers for Justice v. Civil Serv, Comm'n,* 688 F.2d 615, 624 (9th Cir. 1982) (noting that "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandonment of highest hopes.'" (citations omitted)); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (recognizing that a trial court should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained …").

The complexity and expense of class action litigation is well-recognized. *See Schmidt v. Fuller Brush Co.,* 527 F.2d 532, 535 (8th Cir.1975) ( "[r]ecognizing that class actions place an enormous burden of costs and expense upon the parties ..."). Moreover, as has been noted in other class action cases, "the various procedural and substantive defenses likely to be argued to the hilt by the…Defendants, the expense of proving Class Members' claims, the certainty of resolution under this Settlement forecloses any

subsequent appeals, and the fear that the ultimate resolution of the action ... could well

extend into the distant future," all weigh in favor of the Settlement's approval. *In re*

*Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.,* 11-MD-2247 ADM/JJK,

2012 WL 2512750 at *8 (D. Minn. June 29, 2012) (quoting *Snell v. Allianz Life Ins. Co.*

*of N. Am.,* CIV. 97-2784 RLE, 2000 WL 1336640 (D. Minn. Sept. 8, 2000)). The

complexity and expense of continuing the litigation favor granting preliminary approval

of the proposed Settlement.

### 3.  <u>The Proposed Settlement Is the Result of Arm's-Length Negotiation, Which Favors Granting Preliminary Approval:</u>

The terms of the proposed Settlement are the product of arm's-length negotiations

conducted between counsel who are well experienced in complex litigation. *In re*

*UnitedHealth Group Inc. S'holder Derivative Litig*., 631 F. Supp. 2d 1151, 1158 (D.

Minn. 2009) ("The proposed settlement was forged in arm's length negotiations and

aided by an experienced, independent mediator. Discovery has been extensive; the parties

are fully informed of the merits of their claims. Where sufficient discovery has been

provided and the parties have bargained at arms-length, there is a presumption in favor of

the settlement." (quotations omitted)); *Xcel Energy, Inc.,* 364 F. Supp. 2d at 1018.

During the settlement negotiations, Plaintiffs' Lead Settlement Counsel zealously

advanced the position of Plaintiffs and the proposed Class and was fully prepared to

continue to litigate rather than accept a settlement that was not in the best interest of the

Plaintiffs and the proposed Class. Chief Magistrate Judge Arthur J. Boylan actively

supervised and participated in the settlement discussions and assisted the parties where

needed. As such, this factor weighs in favor of granting preliminary approval of the Settlement.

### 4. **Defendant's Finances**:

Defendant is a financially solvent organization. There is nothing in the record to indicate that it will not be able to meet its settlement obligation. *In re UnitedHealth Group Inc.,* 631 F. Supp. 2d at 1157-58. Although Defendant surely is financially capable of paying more for the settlement, this fact standing alone does not render the Settlement inadequate. *Id.* Indeed, the proposed Settlement provides substantial benefits to Class Members. Defendant's contribution of forty-two million dollars ($42,000,000) into the Common Good Fund, as well as its funding the establishment and initial operations of the Licensing Agency, and providing assistance in the Licensing Agency's promotional and market activities, are significant elements of those benefits. As such, this factor also supports a finding of preliminary approval of the proposed Settlement.

Although the Settling Plaintiffs believe that the proposed Settlement merits final approval, the Court need not reach that question yet. The Court is being asked to find whether the proposed Settlement is within the range of possible approval, and whether Class Members should be notified of the terms of the proposed Settlement and the date of final approval hearing to determine whether the court should grant final approval. *See White v. Nat'l Football League,* 822 F. Supp. 1389, 1399 (D. Minn. 1993), *aff'd,* 41 F.3d 402 (8th Cir. 1994), *abrogated by Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). Settling Plaintiffs have satisfied the criteria for preliminary approval and the Court should grant preliminary approval of the proposed Settlement and order notice be

given to the Class.

## C.  <u>THE PROPOSED NOTICE PROGRAM IS APPROPRIATE</u>

Fed. R. Civ. P. Rule 23(e)(1) provides that, in the settlement context, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." According to the *Manual*, Rule 23(e)(1)'s mandatory notice provision applies to all settlement classes, "regardless of whether the class certification under Rule 23(b)(1), (b)(2) or (b)(3)." *Manual*, § 21.312 at 416.

What constitutes reasonable notice under Rule 23(e)(1) depends on case-specific factors. "Trial courts are … afforded considerable discretion in fashioning notice appropriate to the particular circumstances[.]" Newberg § 8.13.

Plaintiffs' Lead Settlement Counsel and Defendant have worked with the Settlement Administrator to fashion a Notice Plan, see Gustafson Aff., Exhibit 2, that comports with due process and is tailored to the specific claims and Class Members of this case. The proposed Preliminary Approval Order requires that the Settlement Administrator notify Class Members of the Settlement by mailing a copy of the Notice of Settlement ("Notice"), attached as Exhibit 2 to the Settlement Agreement, by first class mail to all Class Members who can be identified with reasonable efforts.  The Settlement Administrator and Plaintiffs' Lead Settlement Counsel are working with counsel for the Defendant to obtain lists of Class Members and their last known addresses.

In addition, the publication of the Summary Notice, attached as Exhibit 3 to the Settlement Agreement, will be completed by no later than July 1, 2013. The Settlement Administrator will also set up a 1-800 number to respond to questions from Class

Members; the number will be disclosed during a press conference by the NFL to discuss

the proposed Settlement and will be included in the Notice and the Summary Notice. The

Settlement Administrator will also establish and maintain a website,

www.NFLRetireePublicitySettlement.com, that will provide information about the

proposed Settlement, including the Settlement Agreement itself, the Preliminary

Approval Order, and relevant dates for objecting to the Settlement, excluding oneself

from the Settlement and the date and place of the Final Approval Hearing. The website

also will post the legal papers, briefs and objections and will allow Class Members to

identify themselves so that they can be mailed the Notice. It will also include "Frequently

Asked Questions," substantially similar to those set out in Gustafson Aff., Exhibit 2. The

proposed method of giving notice is appropriate because it is "reasonably calculated to

reach the members of the class." *See Petrovic*, 200 F.3d at 1153. *See also, Benacquisto v.

Am. Exp. Fin. Corp.,* CIV. 00-1980 DSD/JMM, 2012 WL 3292886 at *2 (D. Minn. Aug.

13, 2012).

     The Notice advises Class Members of the essential terms of the Settlement, sets

forth the procedures and deadlines for submitting objections to and requests for exclusion

from the Settlement, and provides specific information on the date, time and place of the

Final Approval Hearing. The Notice also contains information regarding Plaintiffs'

Counsels' fee and expense application. Thus the Notice provides the necessary

information for Class Members to make an informed decision regarding the proposed

Settlement. Plaintiffs' Lead Settlement Counsel believes the Notice Plan will fairly

apprise Class Members of their rights with regard to the proposed Settlement and

therefore is the best practicable under the circumstances and should be approved by the Court. *See Petrovic*, 200 F.3d at 1153.

Based on the proposed schedule set forth above, there are approximately 90 days between the date that the Notice is mailed to known Class Members and is available on the Settlement website and the proposed date of the Final Approval Hearing. In addition, approximately 128 days will elapse between the preliminary approval hearing on March 22, 2013 and the proposed date of the Final Approval Hearing, on or around August 29, 2013. Schedules similar to this time frame have been found more than sufficient to satisfy due process requirements. *See In re Zurn Pex Plumbing Products Liab. Litig.*, 08-MDL-1958 ADM/AJB, 2012 WL 5055810 at *10 (D. Minn. Oct. 18, 2012) ("The opt-out period of 45 days provided for in the Settlement is reasonable."); *Xcel Energy,* 364 F. Supp. 2d 1005 (providing 55 days between mailing notice and final approval hearing); *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 04 CIV. 8144 (CM), 2009 WL 5178546 at *23(S.D.N.Y. Dec. 23, 2009) ("…the Notice plan satisfied due process. Notice was first mailed on November 13, 2009. Objections were due thirty days later on December 14, 2009. Courts have repeatedly found such a time period to constitute sufficient notice.").

As such, the Notice Plan, as set forth in Gustafson Aff., Exhibit 2 and as summarized above, satisfies due process and should be approved by the Court as part of the preliminary approval of the proposed Settlement.

### D. **PROPOSED SCHEDULE FOR APPLICATIONS FOR ATTORNEYS' FEES AND EXPENSES**

Pursuant to the Settlement Agreement, in accordance with the Final Approval Order, the NFL will pay seven million five hundred fifty thousand dollars ($7,550,000) into the Settlement Fund to be used in part for awards to Settling Plaintiffs' Counsel of their fees and expenses. Settling Plaintiffs propose the following process for determining the appropriate attorneys' fees and expenses that should be awarded to Settling Plaintiffs' Counsel in this case.

Settling Plaintiffs' Counsel shall serve and file their applications for attorneys' fees and expenses no later than April 30, 2013. Each application for attorneys' fees and/or expenses shall include an affidavit from a member of the law firm seeking attorneys' fees and expenses attaching detailed time and expense reports that are in compliance with the requirements set forth below:

a. Only time and expenses authorized and incurred on matters that advance the litigation on behalf of all class members will be considered as compensable.

b. "Read and review" time will not be compensated unless the law firm was assigned to work on the submission or otherwise had a compelling reason to do so. No time or expense spent on developing or processing a case for an individual client will be considered or should be submitted.

c. Although attorney fee requests will be viewed through the *Johnson* prism[3], the analysis first requires identifying "compensable" time

---

[3]*Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974). The *Johnson* factors for determining the amount of an attorney fees award are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations

through an illustrative list of germane questions such as those that follow:

    i.  Was the activity authorized?

    ii.  Was the time properly described?

    iii.  Was it necessary?

    iv.  Was it reasonable?

    v.  Was it excessive?

    vi.  Was it duplicative?

    vii.  Did the activity actually advance the litigation on behalf of the class?

d.  Essentially, the only time that is compensable is:

    i.  Time which is properly and timely documented;

    ii.  Time which was authorized; and

    iii.  Time which was necessary, reasonable and actually advanced the litigation on behalf of the class.

e.  The following categories are examples of time that will not be compensated absent extraordinary circumstances:

    i.  Read and review time for persons not overseeing or directly participating in a project.

    ii.  Time spent by each firm creating and compiling any monthly time and expense reports.

---

imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the political undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

    iii.   All time and expense descriptions that are incomplete.

    iv.   Clerical time related to file management.

    v.   Time billed by two or more people from the same firm unless both people are required to attend the same court hearing or meeting or are reasonably necessary to attend or work on a project together.

f.   With regard to the submission and reimbursement of expenses:

    i.   Expense reports should itemize out-of-pocket, case-related expenses on a month by month basis since inception. The report should have a column for the monthly amounts and the column for the cumulative amounts.  If there is a "Miscellaneous/Other" expense item on a report, the item must describe on that month's report the nature of the "Miscellaneous/Other" item.

    ii.   Routine office supplies are not compensable expenses.  Good judgment shall be used on travel and other expenses, and shall be kept within reasonable limits. Personal expenses such as entertainment will not be allowed. Airline travel is to be billed at coach fare; any upgrades will be at the individual's own expense.

    iii.   Unless otherwise addressed below, each expense claim must be properly documented by a receipt or some other form of proof of payment acceptable for ultimate presentation and approval by the Court.  Copies of receipts should be attached to the monthly report for which those expenses were incurred. Originals must be available for production upon request. Cash advances will not be considered for reimbursement without evidence of payment made with the case.

    iv.   All costs of a substantial nature that fall under the following categories qualify to be submitted for consideration for reimbursement. An illustrative list includes:

        1.   **Fax charges (only actual long distance charges):** Contemporaneous records should be maintained and submitted showing faxes sent and received.

        2.   **Postage, Shipping, Courier, Certified Mail:**  All claimed expenses must be documented with bills

showing the sender, origin of the package, recipient, and destination of the package. A contemporaneous postage log or other supporting documentation must be maintained and submitted. Postage charges are to be reported at actual cost.

3. **Printing & Photocopying (in-house)**: A contemporaneous photocopy log or other supporting documentation must be maintained and submitted. The maximum copy charge is $0.15 per page.

4. **Computerized research - Lexis/Westlaw:** Claims for Lexis, Westlaw, and other computerized legal research expenses should be in the exact amount charged to the firm for these research services. Copies of all computerized research bills must be submitted with notations as to which charges relate to this litigation.

5. **Telephone - local and long distance:** Long distance and cellular telephone charges must be documented. Copies of the telephone bills must be submitted with notations as to which charges relate to this litigation.

6. Airfare (Coach rate).

7. Reasonable ground transportation.

8. Reasonable hotel.

9. Reasonable meals.

10. Reasonable other (e.g., parking).

11. Car rentals, cabs, etc.

12. Investigative services.

13. Assessments.

On or before May 30, 2013, Plaintiffs' Lead Settlement Counsel will review each

application for attorneys' fees and reimbursement of expenses and make a comprehensive audit to assure that it complies with the requirements set forth above and make recommended adjustments to the Court, if any, to the requested attorneys' fees and expenses for each law firm. Plaintiffs' Lead Settlement Counsel will also recommend a specific amount that he believes should be awarded to each law firm depending on the quantity and quality of that firm's contribution to the overall outcome of the litigation.

Any objection to the applications for attorneys' fees, expenses or to the adjustments and/or recommendations of Plaintiffs' Lead Settlement Counsel must be served and filed with the Court on or before July 29, 2013. In connection with the Final Approval Hearing, the Court or its designee will, based on its review of such objections and recommendations, make awards based on such applications.

On or before May 30, 2013, Plaintiffs' Lead Settlement Counsel shall also serve and file any requests for service awards for the Settling Plaintiffs in this litigation. Such requests shall set out the amount of service award, if any, requested for each Settling Plaintiff and set forth in detail the basis for each such request. Any objections to these requested service awards shall be served and filed on or before July 29, 2013.

### E.  PROPOSED SCHEDULE OF EVENTS

Settling Plaintiffs and Defendant propose the following schedule of events leading to the Final Approval Hearing as set forth in the Proposed Preliminary Approval Order attached as Exhibit 1 to the Settlement Agreement:

| EVENT | DATE |
|---|---|
| Preliminary Approval Hearing | **March 22, 2013** |
| Publication of Summary Notice | **To be completed by July 1, 2013** |
| Mailing of Notice | **April 30, 2013** |
| Deadline for Applications for Attorneys' Fees and Expenses | **April 30, 2013** |
| Deadline for Plaintiffs' Lead Settlement Counsel to submit recommendations for Attorneys' Fees and Expenses and Requests for Service Awards for Settling Plaintiffs | **May 30, 2013** |
| Mailing Deadline for Objections to Settlement and to Applications for Attorneys' Fees and Expenses, Recommendations of Plaintiffs' Lead Settlement Counsel of Attorneys' Fees and Expense and Requests for Service Awards | **July 29, 2013** |
| Mailing Deadline for Request for Exclusions (Opt-outs) | **July 29, 2013** |
| Deadline for filing papers in support of Final Approval of Settlement | **August 16, 2013** |
| Final Approval Hearing | **On or around August 29, 2013** |

This schedule is similar to those used in numerous class action settlements and provides due process for Class Members with respect to their rights concerning the proposed Settlement.

## **CONCLUSION**

The Settling Plaintiffs and Defendant have reached the proposed Settlement following extensive discussions and arm's length negotiations. For all of the above-stated

reasons, Plaintiffs' Lead Settlement Counsel requests that the Court:

1. Grant preliminary approval of the proposed Settlement reached by Settling Plaintiffs and Defendant;

2. Provisionally certify, for purposes of settlement only, the Class specified in the Settlement Agreement and herein, pursuant to Fed. R. Civ. P. 23(a) and 23(b);

3. Approve counsel previously appointed as Plaintiffs' Lead Settlement Counsel as Settlement Class Counsel and approve Settling Plaintiffs as Class Representatives;

4. Approve the Notice Plan as the best practicable means of providing notice of the Settlement to the Class;

5. Schedule a Final Approval Hearing to consider Settling Plaintiffs' motion for final approval of the proposed Settlement and for entry of the final judgment.

Dated:  March 18, 2013               GUSTAFSON GLUEK PLLC

                                    s/Daniel E. Gustafson
                                    Daniel E. Gustafson, MN #202241
                                    Canadian Pacific Plaza
                                    120 South Sixth Street, Suite 2600
                                    Minneapolis, MN 55402
                                    Telephone:  (612) 333-8844
                                    Facsimile:  (612) 339-6622
                                    dgustafson@gustafsongluek.com

                                    *Plaintiffs' Lead Settlement Counsel on behalf of the Settlement Class*