| | |
|---|---|
| John Frederick Dryer, James Lawrence Marshall, Joseph Michael Senser, Elvin Lamont Bethea, Dante Anthony Pastorini, Edward Alvin White, Fred Lee Barnett, Tracy Anthony Simien, Darrell Alexander Thompson, Jim Ray Smith, Irvin Acie Cross, Bruce Allan Laird, Brian Duncan, Reginald Joseph Rucker, Billy Joe Dupree, Mark Gregory Clayton, Preston Pearson, Reginald McKenzie, Joseph Barney Lemuel, Jackie Larue Smith, Paul James Krause, James Nathaniel Brown, and Michael James Haynes, on behalf of themselves and all others similarly situated, | Civil No. 09-2182 (PAM/AJB) |

Plaintiffs,

v.                                               **MEMORANDUM AND ORDER**

National Football League,

Defendant.

---

This matter is before the Court on Plaintiffs' Lead Settlement Counsel's Motion for Final Approval of Settlement. For the reasons that follow, the Motion is granted.

## BACKGROUND

In brief, this case involves former professional football players who contend that the NFL is violating their common-law and statutory rights of publicity by using images from their playing days in NFL Films productions. From the beginning, however, Plaintiffs have

claimed to have noble motivations that go far beyond the vindication of publicity rights. Indeed, in the first hearing held in this matter in December 2009, Plaintiffs' counsel opened his remarks by stating, "Your Honor, in 2008, in the midst of growing concern and recognition that former NFL players were suffering from dire physical, mental and financial conditions, the United States Congress held hearings to explore the root causes of that problem. . . ." (Hr'g Tr. (Docket No. 31) at 19 (December 16, 2009).)

Those noble motivations have now been trampled by some individual Plaintiffs' baser instincts, namely the lure of what their attorneys promise is lucrative financial payouts from the NFL. Rather than continue to work for the good of the class—a class that includes many former players who could never hope to recoup even pennies from their brief playing days but who may suffer physical and mental injuries from their time in the NFL—these individuals and their attorneys have worked tirelessly to manipulate the opinions of the class and present themselves as championing the side of justice.

Despite those efforts, however, the vast majority of class members see the settlement at issue here for what it is: a boon to those thousands upon thousands of former NFL players who can now reap the collective benefit of a large financial payout to a fund organized solely for their benefit, overseen by their comrades-in-arms. That former players will also finally have an avenue to pursue commercial interests in their own images and in their images as part of their former teams, for the first time in conjunction with the NFL's copyrights and trademarks, is icing on the cake for those players and indeed for all former players. The continued complaints from those opposing the settlement that they are receiving no direct

personal benefit therefrom only highlights the extent to which they have strayed from their initial goal of providing for those less fortunate.

## DISCUSSION

This Court granted preliminary approval of the settlement on April 5, 2013. (Docket No. 270.) The preliminary approval Order also conditionally certified a Settlement Class and directed the method and means of notice to the class members. That notice was accomplished as intended,[1] due no small part to the efforts of Plaintiffs' Lead Settlement Counsel, who was forced to contend with the filing of duplicative lawsuits and the dissemination of misleading and sometimes outright false information about the settlement. The opt-out period closed with 2,073 class members seeking to opt out of the settlement. Thirty-eight additional class members submitted requests for exclusion outside the opt-out period, but despite their untimeliness, the Court has determined that these requests should be granted. One class member inadvertently withdrew his exclusion request; he has been excluded from the class. Finally, 19 class members filed timely objections to the settlement, although seven of these also requested to be excluded from the class and have been excluded. The objections these seven individuals raise do not differ from those submitted by other objectors, and the Court has considered all objections in evaluating the settlement.

After the supplemental notice necessitated by the violation of the preliminary

---

[1] None of the objecting Plaintiffs takes issue with the notice in any respect. The Court finds that the notice satisfied the requirements of due process and Rule 23. Further, the notice to state and federal officials satisfies 28 U.S.C. § 1715.

injunction in the preliminary approval Order, 158 class members timely withdrew their requests for exclusion, and six additional class members filed untimely withdrawals of their requests for exclusion. The Court will include all of these individuals, with the exception of the individual who inadvertently withdrew his exclusion request, in the Settlement Class.

A complete list of those excluded from the class is found in Exhibit A to this Order.

## A.    Evaluation of Settlement Under Rule 23(e)

"Under Rule 23(e), the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975). The Court must evaluate whether the proponents of the settlement have shown it to "be fair, reasonable, and adequate." Id. In this case, the Court's role as guardian of the rights of absent class members is especially important, given the rhetoric and conflict among the members of the Settlement Class, who in the usual case would be zealously protecting those rights.

The Court analyzes "four factors in determining whether a settlement is fair, reasonable, and adequate: (1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 932 (8th Cir. 2005). "The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." Van Horn v. Trickey, 840 F.2d 604, 607 (8th Cir. 1988). The Court will address the four factors

in reverse order.

**1.      Opposition to the Settlement**

Although the objections have been especially vociferous in this matter, only one-tenth of one percent of the class objected, and less than ten percent of the class has requested exclusion from the settlement.  This is far less than other settlements found to be fair, reasonable, and adequate.  See, e.g., Van Horn, 840 F.2d at 606 (affirming district court's approval of settlement despite that 180 of 400 class members, or 45%, sought exclusion).

More importantly, the objections raised here are without merit.  Nearly all of the objections boil down to what is, in the Court's view, the objectors' very mistaken belief that they could reap significant financial benefits from continuing this case.  The objectors maintain that a settlement that does not include direct financial benefit to the class is impermissible.  They are wrong.

As discussed more fully below with respect to the strength-of-case factor, the chances that this lawsuit—or indeed any class-action lawsuit seeking to recoup sums for the alleged infringement of former NFL players' publicity rights by NFL Films—will succeed are slim at best.  Too many obstacles stand in the way of that success.  But the objectors want a financial payout more than they want to embrace the reality of the limitations of their claims. Fortunately for the absent class members, experienced counsel and a knowledgeable and extremely capable Magistrate Judge saw the case for what it was, and negotiated a settlement that is truly one-of-a-kind, and a remarkable victory for the class as a whole.

Objectors also contend that settlement should not be approved because the Common

Good Fund will dissolve in ten years, noting that the Settlement Agreement provides that any unspent funds contributed by the NFL will at that time revert to the NFL. First, there is no indication that the Common Good Fund will dissolve in ten years' time. Rather, the Fund will continue to operate with the interest from the NFL's disbursements and the revenue from the Licensing Agency. And the fact that the Settlement Agreement requires the Common Good Fund to disburse all NFL contributions within ten years is not nefarious in the least. That requirement merely ensures that the Fund uses the money and does not merely hold the money for unspecified future uses. Moreover, if there is money left from the NFL's contributions at the end of the ten-year period, that money does not merely revert back to the NFL. The NFL must use the money for Fund Charitable Uses, as defined in the Settlement Agreement.

Because this settlement is unique, there is little precedent on which either side can rely for their arguments. The settlement is not a cy pres distribution, as some objectors claim, but it is also not the usual resolution of class claims. But this is not a "usual" case. This is a case involving a large, diffuse class of individuals with very different potential damages and very different present-day needs. The settlement is the best solution for the difficulties of this class and these claims. The objections are therefore overruled, and the amount-of-objections factor weighs in favor of the settlement.

### 2. Complexity and Expense of Further Litigation

There is no doubt that further litigation in this matter would be both complex and extraordinarily expensive. As an initial matter, the settlement provides that the NFL can

deduct up to $13.5 million from its Common Good Fund contribution to pay for expenses related to opt-out claims. If $13.5 million is necessary for the NFL to litigate a small portion of the class's claims, then the funds necessary to litigate this large class action to a conclusion are far greater.

Further litigation would also be complex. Discovery has not yet been fully accomplished, and will be a time-consuming process, necessitating inquiries into such issues as the content of the retired player's contract(s), whether that player ever appeared in an NFL Films production, and the extent of any appearance. Further litigation will require a choice-of-law analysis, discussed in more detail below, that must evaluate the claims of a nationwide class asserting personal rights. The class certification process would undoubtedly be hard-fought and would also require a detailed analysis of the claims of the class members. Plaintiffs' claims themselves are complex because they involve not just claims of injury but also implicate constitutional principles. And finally, determining damages in this case would require individual inquiries that are exceedingly time-consuming and complex. This factor weighs in favor of the settlement.

### 3. Defendant's Financial Condition

As noted in the preliminary approval Order, there is no issue with the NFL's financial condition. The NFL is fully able to pay what it has committed to pay; it is also fully able to continue to litigate this matter vigorously and defend itself against the class's claims should it be necessary to do so. This factor is neutral in the Court's analysis.

Some of the objectors contend that the Court has insufficient information about the

NFL's finances to fully evaluate the settlement. But the NFL did submit information to Plaintiffs and to Chief Magistrate Judge Boylan about its finances during the course of settlement negotiations. Indeed, Chief Magistrate Judge Boylan required the NFL to submit sufficient information to allow Plaintiffs to evaluate settlement options. The fact that he did not admonish or sanction the NFL for any failure to comply with this requirement indicates that the NFL fully complied with it. Objectors complain that the information submitted was not filed with the Court. The information the NFL submitted, however, was submitted according to Chief Magistrate Judge Boylan's protective orders in the case, which precluded such documents from being filed or even discussed publicly. Such an order was necessary to ensure that all parties engaged in full and frank settlement discussions, discussions that bore the fruit of this settlement.

When information is submitted to Chief Magistrate Judge Boylan, it is submitted to this Court. There can be no doubt that the NFL submitted sufficient information to allow the Court to guide settlement negotiations and to evaluate the eventual settlement of this matter. Without such information, Chief Magistrate Judge Boylan and the parties would not have been able to fashion a settlement. Thus, the objectors' contentions on this point are not well-taken.

### 4.      Merits of Plaintiffs' Case vs. Terms of Settlement

This factor is, as noted above, the most important factor when analyzing the fairness, reasonableness, and adequacy of a class-action settlement. In this case, there is no question that the factor weighs heavily in favor of the settlement.

The preliminary approval Order listed two of the many difficulties with the merits of Plaintiffs' case: statute of limitations issues and class-certification issues. These issues are substantial, but there are many other substantial issues with the ultimate success of Plaintiffs' claims here.

### a.    <u>Statute of limitations</u>

The statute of limitations would bar the claims of many members of the Plaintiff class. At its longest, the statute of limitations is six years, and thus no Plaintiff is entitled to compensation for any unauthorized use of his image before 2003. It is probable that the majority of class members' images have not been used in NFL Films at all since 2003, if they were ever used. The statute of limitations means that class members' claims, if any, are likely severely limited in value.

### b.    <u>Choice-of-law analysis</u>

The Court has repeatedly warned Plaintiffs that ultimate class certification is highly problematic, if not unlikely. This is so for several reasons. First, it is likely that each Plaintiff's claim will be governed by the law of the state in which that Plaintiff resides, or the home state of the Plaintiff's former team. Objecting Plaintiffs insist that the law of New Jersey will govern, but the Amended Complaint raises the law of more than 20 states, and objecting Plaintiffs offer nothing more than conclusory arguments for their contention that New Jersey's law will apply.

To determine what state's or states' laws should apply to Plaintiffs' claims, the Court must first evaluate whether there is a conflict among the states' laws that are potentially

applicable to the claims. Those laws potentially applicable here would include the laws of the states in which each Plaintiff played football, the laws applicable to each Plaintiff's contract(s) with his team(s), the laws of the states in which Plaintiffs now reside, and the law of the NFL's home state and NFL Films's home state. Some of these states have statutes setting forth the parameters of rights of publicity. See, e.g., Cal. Civ. Code § 3344; Fla. Stat. § 540.08. Others rely on their common law to establish such rights. See Ventura v. Titan Sports, Inc., 65 F.3d 725, 730 (8th Cir. 1995) ("We believe that the Minnesota Supreme Court would recognize the tort of violation of publicity rights."). And still others do not recognize such rights at all. See ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915, 928 n.13 (6th Cir. 2003) (noting that "[a]pproximately half of the states have adopted some form of the right of publicity, either at common law or by statute"). The chance of a conflict between the various applicable state laws is thus very high.

Because there is a conflict in the potentially applicable laws, the Court must then determine which state's law to apply. But the right of publicity is treated in some jurisdictions as a property right and in others as a tort, and thus the choice-of-law analysis is even more complicated. See Allison v. Vintage Sports Plaques, 136 F.3d 1443, 1446 n.6 (11th Cir. 1998) (because some states treat publicity rights as property, courts use choice-of-law rules applicable to personal property, not torts). For example, because California treats the right of publicity as a property right, if the player played in California or signed contracts specifying the application of California law, California law requires that the dispute be governed by the law where the player is domiciled. See Cal. Civ. Code § 946 (disputes

involving personal property are governed by the law of the domicile of the owner of the property right).

Minnesota treats the violation of the right of publicity as a tort, however, and the Minnesota choice-of-law analysis involves consideration of five factors: (1) predictability of result, (2) maintenance of interstate order, (3) simplification of the judicial task, (4) advancement of the forum's governmental interests, and (5) application of the better rule of law. Milkovich v. Saari, 203 N.W.2d 408, 412 (Minn. 1973). The Court must apply these five factors "with respect to each plaintiff class member" before determining which state's law applies. In re St. Jude Med., Inc., 425 F.3d 1116, 1120 (8th Cir. 2005); see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 822-23 (1985) (holding that individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action). Given that the class is composed of nearly 25,000 individuals, the choice-of-law inquiry is extremely complex and weighs heavily against ultimate certification of the class.

The Minnesota Supreme Court has directed courts to consider the predictability of the results factor in order to "fulfill the parties' justified expectations." Jepson v. Gen. Cas. Co. of Wis., 513 N.W.2d 467, 470 (Minn. 1994). To evaluate this factor in the context of this case, the Court must evaluate each Plaintiff's and the NFL's expectations about what law might apply to a publicity-rights claim. Where Plaintiffs played in various locations, for teams located throughout the United States, it is likely that they would have expected that the vindication of their publicity rights would be subject to the law where their team was located or where they themselves lived. Thus, the predictability-of-results factor would favor the law

of the many different states in which Plaintiffs played and lived.

Similarly, the interstate-order factor favors the application of the law of states closely connected to Plaintiffs, such as the home state of their team(s) or their own homes. This factor requires that the state whose laws are applied have sufficient contacts with the facts in issue. The right of publicity is a personal right, protecting "the ability of public personae to control the types of publicity that they receive." <u>Ventura</u>, 65 F.3d at 730. Thus, the laws of the states in which Plaintiffs lived and played have more than sufficient contacts with the facts. The home state of NFL Films also has sufficient contacts with the facts at issue, but at best this factor is neutral in the choice-of-law analysis.

In the usual case, the simplification-of-judicial-task factor is neutral in the Court's choice-of-law analysis. Here, however, where it is possible that the law of many different states may apply to Plaintiffs' claims, this factor highlights the unmanageability of the class action apparatus in the instant situation.

Minnesota has very little governmental interest in vindicating the publicity rights of non-residents or Plaintiffs who did not play football for a Minnesota team. However, the Court must consider not only Minnesota's interest, but also the public policy interest of all of the other states whose laws might potentially apply. <u>See</u> <u>Lommen v. East Grand Forks</u>, 522 N.W.2d 148, 152 (Minn. Ct. App. 1994) (governmental interest factor implicates "the relative policy interests of the [] states" whose laws conflict). Other states undoubtedly have different policy interests in protecting or not protecting public figures' publicity rights. This is evident from the fact that some states recognize such rights and others do not. On this

preliminary record, the Court cannot say definitively that this factor weighs against the application of a single state's law to Plaintiffs' claims. However, given the very different treatment of publicity rights under state laws, it is more likely than not that the relative policy interests will require the application of laws other than New Jersey's.

Finally, the better-choice-of-law factor applies only if the first four factors do not resolve the choice-of-law question. <u>Myers v. Gov't Employees Ins. Co.</u>, 225 N.W.2d 238, 244 (Minn. 1974). Because the first three factors likely weigh in favor of the application of different states' laws to Plaintiffs' claims, discussion of which states' law is "best" is not necessary.

The choice-of-law analysis in this case is exceedingly complex. Even if it were simple, however, the fact remains that it is likely that the law of many different jurisdictions will apply to Plaintiffs' claims. This makes the manageability of a class action highly problematic.

        c.    <u>Damages</u>

Next, each Plaintiff is entitled to claim very different damages. Plaintiff Fred Dryer, for example, was featured in at least one NFL Films' production, and assuming that he had no contract with the NFL regarding this production and that his claims are not barred by the relevant statute of limitations, his damages could be relatively substantial. A member of the defensive squad for the 1986 Super Bowl runner-up New England Patriots, however, might appear briefly in a documentary about the Super-Bowl-winning Chicago Bears, but that image would be fleeting and entitled to little, if any, compensation.

d.     <u>Other considerations</u>

Finally, there are likely to be significant differences in the way each Plaintiff's contract or contracts with his team(s) dealt with publicity rights. The law regarding rights of publicity has evolved substantially in the decades since the formation of the NFL, and each former player's contract must be examined to determine whether such rights are covered by the terms of the contract as well as the extent and duration of such coverage.

There are more fundamental difficulties with Plaintiffs' claims, however. Plaintiffs played a team sport, where at any given time there are 22 men on the field of play. Any image from a game would almost by necessity include more than one individual and often includes many individuals. The apportionment of publicity-rights damages among the individuals featured—whether players, coaches, sideline workers, officials, cheerleaders, or others—is a Herculean task.

Each individual appearing in a game clip has publicity rights in his or her image. But the value of those rights must be divided among all those appearing in some way. Would a court apportion more value to a team's quarterback, because he stands above the line of scrimmage and is more visible in any game clip? Or perhaps a player with a distinctive hair-do, such as current Pittsburgh Steeler Troy Polamalu, deserves more compensation because his image is readily identifiable? Magnify these individual issues times 53 players on each of 32 teams' active rosters each year, and it is easy to see that determining damages on either

an individual or a class-wide basis would be nearly impossible.[2]  Indeed, counsel for some objectors seemed to concede as much when he argued that there is no easy model to value the publicity rights in this case because "[f]ootball is a team sport."  (Hrg. Tr. at 33.)  This statement pinpoints the myriad difficulties with Plaintiffs' case here.

    e.    Benefits of settlement

    On the other hand, as discussed preliminarily above, the benefits of the settlement are numerous and far-reaching.  Not only does the settlement benefit most those for whom this litigation was ostensibly brought, but it benefits all class members, not just those who are well-known or whose publicity rights are the most valuable.  Yet it benefits these well-known class members as well by providing an avenue, through the Licensing Agency, for class members to receive payments directly commensurate with the value of their publicity rights.

---

[2]    While class treatment of this dispute poses significant manageability concerns, even more problematic is the likelihood of any individual incurring enough damages on their claims to make pursuit of individual actions worthwhile.  As an example, the NFL's website offers a 240-minute film about the history of the Minnesota Vikings for $26.95.  Even with the very generous assumption that 50 percent of the purchase price constitutes profit for NFL Films that is attributable to the video's use of player images (and not, for example, editing, sound, and all the other artistic contribution that goes into the video), that is profit of five cents per minute of film.  If a game in which a retired Vikings player played is featured in one segment, footage of that particular game may run for 30 seconds.  The profit per DVD for that 30-second clip of game footage is 2.5 cents.  But there are 22 men on the field during a single play, assuming that the footage shows only one play.  Twenty-two former players thus have a potential claim to 2.5 cents of profit per DVD.  The statute of limitations can under no circumstances extend before 2003, so the damages stem only from the DVDs sold from 2003 to the present.  If 50,000 DVDs were sold in that period, the total profit attributable to that 30 seconds of game footage is $1,250, which split 22 ways is not quite $57 per player.  Even if 200,000 DVDs were sold, the potential damages are only approximately $200.  Such minimal damages cannot form the basis of individual actions.

For the first time, entities will be allowed to license individual players' publicity rights, or the rights of groups of players, in conjunction with the NFL's copyrights and trademarks. Seventy-five percent of the fees generated from such licenses will be paid directly to the players whose publicity rights are licensed, thus providing a direct benefit closely aligned with the value of that players' claims here. Twenty-five percent of the fees will be paid to the Common Good Fund for the benefit of the class as a whole. The objection that the settlement offers no economic value to the class or to individual class members is therefore patently false. Finally, should the Licensing Agency be unable to market individual and group publicity rights because of lack of market demand, then it is clear that the class did not truly suffer the damages alleged in this case.

Further, counsel's implication at the hearing that the value of the right the Settlement Class is giving up is equal to the total market value of NFL Films is preposterous. As counsel well knows, the value of NFL Films it is not equivalent to the sum total of the value of the publicity rights of the players featured in all NFL Films' productions. Much more goes into an NFL Films production than mere editing of game film, and all of those diverse aspects of the production have value. Plaintiffs' claims are worth significantly less than the total value of NFL Films, for all the reasons discussed above. Counsel's insistence that further discovery is necessary also ignores the fact that Chief Magistrate Judge Boylan was satisfied that the damages discovery produced was sufficient to allow Plaintiffs to make educated settlement demands and to settle the case on reasonable and just terms. Merely because some objectors' counsel would like more information does not render the

information produced incapable of allowing for a fair and reasonable settlement.

The objectors also overlook the substantial payment the NFL is making to the Common Good Fund. This Fund will provide substantial benefits to the class as a whole. The Fund is overseen by a Board made up of class members (see Docket No. 270 at 19-20), and will disburse the funds in accordance with the Fund Charitable Uses set forth in the Settlement Agreement. These Uses are directly beneficial to class members.

Both the Licensing Agency and the Common Good Entity are independent of the NFL, the players' union, and any other organization that currently exists to act on behalf of retired players. This autonomy will protect the rights and interests of all class members, and will allow the Board of the Common Good Fund to determine where the gaps are in the benefits that currently exist for retired players. In short, the settlement provides benefits to the class far beyond direct economic benefits arising out of the alleged infringement of players' publicity rights, which for the vast majority of class members could be meager, at best.

**B.** **Settlement Class**

To effectuate the Settlement, the Court conditionally certified the following Settlement Class:

> All individuals who, prior to or as of the date of this Order, were or are on the roster of any Member Club and who, as of the date of this Order, (a) have retired, formally or informally, from playing professional football with the NFL or any Member Club, or (b) were formerly on any roster of any Member Club and are no longer under contract to a Member Club and are not seeking active employment as an NFL player with any Member Club (collectively, "Retired Players"); and for Retired Players who are deceased, all of their

respective heirs, executors, administrators, beneficiaries, successors, and assigns who own or control their Publicity Rights.

For purposes of settlement, the Court finds that the requirements of Rule 23 have been satisfied with respect to this class.[3] Specifically, the Court finds that, for the purposes of effectuating the settlement, the class is so numerous that joinder is impracticable, there are questions of law and fact common to the class, the class representatives' claims are typical of the claims of the class, counsel has fairly and adequately represented the class, common questions predominate over individual questions, and a class action is the superior method of resolving this case.[4] See Fed. R. Civ. P. 23(a) and (b)(3). The Court therefore finally certifies this class for purposes of settlement.

For the purposes of settlement, and according to Rule 23(g), the Court confirms the appointment Daniel E. Gustafson of the law firm Gustafson Gluek PLLC as Plaintiffs' Lead Settlement Counsel for the Settlement Class. Mr. Gustafson has performed admirably in this case, he is experienced in class actions and complex litigation, and he is more than familiar with the claims and the law applicable to this case. As noted, he has effectively consulted with other counsel in the matter and has the resources to commit to the representation of the Settlement Class members. As Plaintiffs' Lead Settlement Counsel, Mr. Gustafson shall continue to represent the Settlement Class in any further proceedings in this Court.

---

[3] The objectors do not dispute that final certification of a settlement class is appropriate.

[4] The final factor in the Rule 23 analysis, "whether the case, if tried, would present intractable management problems," is not relevant in the certification of a settlement class. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997).

**C.     Attorney's Fees, Expenses, and Service Awards**

The Court refers the Motions for Attorney's Fees and the issue of class representative awards to Chief Magistrate Judge Arthur J. Boylan pursuant to 28 U.S.C. § 636(b)(1)(A).

**D.     Preliminary Injunction**

Plaintiffs' Lead Settlement Counsel has requested that the Court extend the preliminary approval Order's injunction against duplicative litigation until final judgment, including the expiration of the time to appeal or the exhaustion of all appeals, is entered in this case. However, should an appeal be taken from this Order, the Court of Appeals should have the opportunity to determine whether an injunction is necessary during the pendency of an appeal. The Court declines the request to extend the injunction through the pendency of any appeals. Rather, the injunction will expire 30 days after the time for taking an appeal has run, or 30 days after the matter is appealed, whichever occurs first.

**E.     Release of Claims**

All Class Members (except those excluded from the Settlement Class) have fully, finally, and forever released the following Claims

1.     All Claims arising out of or related in any way to any use of Publicity Rights by the NFL Parties at any time up to and including the date of this Final Approval Order including, without limitation, all uses in any geographic location, in any media or format (including, but not limited to, analog, digital or other media or formats, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio

works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms), and in any type of use whatsoever.

2. All Claims arising out of or related in any way to any uses of Publicity Rights by the Released Parties before or after the date of this Final Approval Order, at any time in perpetuity, in any geographic location, in any media or format (whether now known or hereinafter developed), that publicize, promote, market, or advertise the NFL, any Member Clubs, the sport of NFL football, or any NFL football game. Without limiting the foregoing, the release in this section covers all of the following uses of Publicity Rights: (a) by any NFL Party in films, audiovisual works, photographs, images, depictions, or any other media or format; (b) by any Released Party to publicize or promote NFL football games, ticket sales, or the brands of any NFL Parties; (c) by any Released Party in NFL game broadcasts and telecasts; (d) by any released Party in programming relating to the NFL, one or more Member Clubs, and/or their games and events (e.g., coaches' shows, highlight-based shows such as Inside the NFL, or behind-the-scenes programming such as Hard Knocks); and (e) by any Released Party in other NFL-related media offerings (e.g., branded content segments featuring NFL Game Footage and other programming enhancements), NFL media distribution platforms (e.g., NFL.com, NFL Mobile, NFL Network), official events (e.g., NFL Kickoff, NFL Draft), officially sanctioned awards programs (e.g., Rookie of the Year), or public

service or community oriented initiatives (e.g., Play60); provided, however, that the release in this section does not include any use of Publicity Rights in a manner that constitutes an "endorsement" by a Class Member of a non-NFL Party brand, product, or service; provided, further, that a use by a non-NFL Party of NFL Game Footage, including in advertising and promotional materials, that is authorized by an NFL Party and that does not unduly focus on, feature, or highlight, a NFL Player in a manner that leads the reasonable consumer to believe that the NFL Player is a spokesperson for, or promoter of, the non-NFL Party's brand, product, or service, is not an "endorsement." Nothing in this section will be construed to release any Claims with respect to any uses of Publicity Rights after the Effective Date in "consumer products," in any media or format, including digital or electronic media (e.g., video games, trading cards and apparel); provided, however, that "consumer products" does not include media or programming uses (as set forth in clauses (a) through (e) above (other than "endorsements")).

## F.    Terms of Settlement

The Settlement Agreement provides that Class Members (except those excluded from the Settlement Class):

1.    covenant and agree that none of them, and no person authorized to act on behalf of any of them, will commence, authorize, support (financially, or through testimony, or by any other means), or accept any benefit from any

21

judicial or administrative action or proceeding, whether now pending or hereafter commenced, against any of the Released Parties with respect to any of the Released Claims;

2.     waive and disclaim any right to any form of recovery, compensation, or other remedy in any such action or proceeding brought by or on behalf of any of them with respect to any of the Released Claims;

3.     agree that the Settlement Agreement will be a complete bar to any action described in this Paragraph 17; and

4.     covenant and agree that none of them, and no person authorized to act on behalf of any of them, will hereafter contest in any forum or venue the exclusive rights of any of the NFL Parties to (a) telecast, broadcast, or otherwise distribute, transmit, or perform, on a live, delayed, or archived basis, in any and all media or formats now known or hereafter developed, any NFL Game Footage or (b) produce, license, offer for sale, sell, market, or otherwise distribute or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any NFL Game Footage, in any and all media or formats now known or hereafter developed, including, but not limited to, packaged or other electronic or digital media. The covenant in this Paragraph 17.d does not authorize any use of Publicity Rights in a manner that constitutes an "endorsement" by any Class Member of a non-NFL Party brand, product, or service, as "endorsement" is defined in Paragraph 16.b.

This final approval Order, the Settlement Agreement, and the documents relating thereto, are not, and should not in any event, be (a) construed, deemed, offered or received as evidence of a presumption, concession or admission on the part of any of the Settling Plaintiffs, Defendant, any member of the Settlement Class or any other person; or (b) offered or received as evidence of a presumption, concession or admission by any person of any liability, fault, wrongdoing or other dereliction of duty for any purpose in any judicial or administrative action or proceeding, whether in law or in equity.

If for any reason the judgment does not become final in this action, Defendant's conditional withdrawal of its objections to the certification of a Settlement Class will be null and void in its entirety; this final approval Order will be vacated; all Plaintiffs and Defendant will return to their respective positions in this Action as those positions existed immediately before the execution of the Settlement Agreement; and nothing stated in the Settlement Agreement or in this final approval Order will be deemed an admission or waiver of any kind by any Plaintiff or Defendant or used as evidence against, or over the objection of, any Plaintiff or Defendant for any purpose in this Action or in any other action or proceeding of any kind.

The parties to the Settlement Agreement, and their agents, employees, and attorneys, will not be liable for anything done or omitted in connection with these proceedings, the entry of this final judgment, or the administration of the Settlement Fund, except for their own willful misconduct.

## G.    Remaining Plaintiffs

Finally, three of the named Plaintiffs in this case have chosen to opt out of the settlement:  John Frederick Dryer, Elvin Lamont Bethea, and Edward Alvin White.  Their claims will therefore continue on an expedited basis and they shall appear before Chief Magistrate Judge Boylan within 30 days of the date of this Order for a pretrial conference.  The Court anticipates that Chief Magistrate Judge Boylan will set a short timeline for any additional discovery and dispositive motions, and that trial of the matter can be accomplished in the first half of 2014.

## CONCLUSION

The settlement in this matter is fair, reasonable, and adequate.  Accordingly, **IT IS HEREBY ORDERED that**:

1.    Plaintiffs' Motion for Final Approval (Docket No. 405) is **GRANTED** as fully set forth above;

2.    The objections to the settlement are hereby overruled;

3.    The Settlement Class is finally certified as set forth above;

4.    The individuals listed in Exhibit A to this Order are excluded from the Settlement Class;

5.    On the effective date, as defined in the Settlement Agreement, Defendant will provide the relief to the class members in the manner and at the times provided for in the Settlement Agreement;

6.    Defendant must deposit $7,550,000 into the Settlement Escrow Account within

10 business days of the effective date, as defined in the Settlement Agreement, to be used to (1) pay awards of attorney's fees and expenses to be determined, (2) pay service awards to certain Settling Plaintiffs to be determined, and (3) to establish and for initial operating expenses of the Licensing Agency. After 24 months, all money remaining in the Settlement Escrow Account shall be transferred to the Common Good Fund;

7. The preliminary injunction in the Preliminary Approval Order shall expire 30 days after the time for taking an appeal has run, or 30 days after an appeal is taken, whichever occurs earlier;

8. Judgment is hereby entered **DISMISSING with prejudice**, on the merits, and without taxation of costs in favor of or against any party, all claims that were or could have been asserted herein by all class members except those excluded from the class. The Court retains jurisdiction for all purposes over all individual claims filed by those named Plaintiffs in this action who are excluded from the Settlement Class;

9. The Motions for Attorney's Fees (Docket Nos. 278, 280, 282, 285, 287, 289, 291), Plaintiffs' Lead Settlement Counsel's reports on the same, and Plaintiffs' Lead Settlement Counsel's recommendations for class representative awards are hereby **REFERRED** to Chief Magistrate Judge Arthur J. Boylan pursuant to 28 U.S.C. § 636(b)(1)(A);

10. The individual named Plaintiffs who have been excluded from the Settlement

Class shall appear for a pretrial scheduling conference before Chief Magistrate Judge Arthur J. Boylan within 30 days of the date of this Order, and can anticipate shortened deadlines for discovery and motion practice, and a trial date in the first half of 2014; and

11. There being no just reason for delay, the Clerk shall enter final judgment under Fed. R. Civ. P. 54 in accordance with the terms of this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   November 1, 2013

   s/Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge