# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

———————————————————— )
John Frederick Dryer, )
Elvin Lamont Bethea, and, )
Edward Alvin White, ) No. 0:09-cv-02182-PAM-AJB
 )
               Plaintiffs, )
v. )
 )
National Football League, )
 )
               Defendant. )
———————————————————— )

## NATIONAL FOOTBALL LEAGUE'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 3

I.    The Challenged Programs Are Protected By State Safe Harbors And The
      First Amendment. ................................................................................................. 3

      A.    The challenged programs and their contents are undisputed, and
            Plaintiffs cannot create a genuine issue of fact by citing unrelated
            raw-footage licenses. ................................................................................... 3

      B.    The challenged programs are protected by safe harbors in each
            state's right-of-publicity law. ..................................................................... 4

            1.    Programs showing Dryer – New York and California law. .................. 5

                  a.  New York law. ............................................................................. 5
                  b.  California law. ............................................................................. 6
            2.    Programs showing Bethea – Texas law. .............................................. 7
            3.    Programs showing White – California and Minnesota law. ................. 8
            4.    New Jersey law – no Plaintiff ............................................................. 9

      C.    The challenged programs are protected by the First Amendment,
            barring Plaintiffs' right-of-publicity claims. ............................................ 10

            1.    The challenged programs cover events of great public interest
                  and thus receive full First Amendment protection. ........................... 10
            2.    The challenged programs are not commercial speech. ....................... 10

                  a.  The *Porous* factors reinforce the conclusion that the
                      programs are not commercial speech. ........................................ 11
                  b.  Sports programming does not become an advertisement
                      because it has the purpose or effect of enhancing the brand
                      of its producer. ......................................................................... 12
            3.    Any brand-enhancing effect of the programs is inextricably
                  intertwined with their expressive elements. ...................................... 14
            4.    First Amendment interests outweigh Plaintiffs' right-of-publicity
                  interests, particularly since Plaintiffs benefitted from the
                  programs. .......................................................................................... 14

      D.    The challenged programs are protected speech under the Lanham
            Act. ........................................................................................................... 16

II.   The NFL's Equitable Defenses Bar Plaintiffs' Claims. ......................................... 18

A.     The material facts of Plaintiffs' knowledge, delay, and active support for the challenged programs are undisputed. .............................................. 18

B.     That the NFL's equitable defenses are for the Court to decide is also undisputed. ........................................................................................ 18

C.     Plaintiffs' claims are equitably barred. ...................................................... 19

    1.   Ignorance of the law is no defense to Plaintiffs' decades-long delay. ................................................................................................ 19

    2.   There is ample evidence of prejudice caused by Plaintiffs' inexcusable delay. ............................................................................. 20

    3.   Plaintiffs' support of and participation in the programs establish acquiescence. ..................................................................................... 22

    4.   The NFL comes to the Court with clean hands. ................................... 23

D.     Plaintiffs' state-specific arguments are unfounded. ................................... 24

III.   Plaintiffs' State-Law Claims Are Preempted By The Copyright Act. .................. 25

IV.    The LMRA Preempts Plaintiffs' State-Law Claims. ........................................... 27

CONCLUSION ....................................................................................................... 28

# Table of Authorities

**FEDERAL CASES**                                                                    **PAGE(S)**

*Alexander v. Phillips Petroleum Co.*,
130 F.2d 593 (10th Cir. 1942) ................................... 19

*Am. Dairy Queen Corp. v. New Line Prods.*,
35 F. Supp. 2d 727 (D. Minn. 1998) ........................... 18

*Anheuser Busch, Inc. v. Balducci Publ'ns*,
28 F.3d 769 (8th Cir. 1994) ...................................... 16

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537 (S.D.N.Y. 2013) .......................... 5

*Bolger v. Young's Drug Prods. Corp.*
463 U.S. 60 (1983) ................................................. 11

*Brown v. Elec. Arts, Inc.*,
724 F.3d 1235 (9th Cir. 2013) ................................... 17

*Brown-Mitchell v. Kan. City Power & Light Co.*,
267 F.3d 825 (8th Cir. 2001) ..................................... 21

*C.B.C. Dist. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*,
505 F.3d 818 (8th Cir. 2007) ................................ 8, 14

*Cardtoons, L.C. v. Major League Baseball Players Ass'n,*
95 F.3d 959 (10th Cir. 1996) ..................................... 17

*CBS Interactive Inc. v. National Football League Players Ass'n, Inc.*,
259 F.R.D. 398 (D. Minn. 2009) ............................ 8, 16

*Citizens & Landowners Against Miles City/New Underwood Powerline v. Sec'y, U.S. Dept. of Energy*,
683 F.2d 1171 (8th Cir. 1982) ................................... 19

*Conan Props., Inc. v. Conans Pizza, Inc.*,
752 F.2d 145 (5th Cir. 1985) ..................................... 23

*Dryer v. NFL*,
689 F. Supp. 2d 1113 (D. Minn. 2010) ................... 1, 6, 16

*Films of Distinction, Inc. v. Allegro Film Prods., Inc.*,
12 F. Supp. 2d 1068 (C.D. Cal. 1998) ......................... 17

*Goodman v. McDonnell Douglas Corp.*,
 606 F.2d 800 (8th Cir. 1979) ....................................................................................... 20

*Halstead v. Grinnan*,
 152 U.S. 412 (1894) ...................................................................................................... 19

*Hart v. Elec. Arts, Inc.*,
 717 F.3d 141 (3d Cir. 2013) ......................................................................................... 15

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
 191 F.3d 813 (7th Cir. 1999) ........................................................................................ 22

*Jones v. Boyd Transfer & Storage Co.*,
 323 F.2d 998 (8th Cir. 1963) ........................................................................................ 18

*Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of Missionaries &
 Pilots, Inc.*,
 No. 03-cv-6173, 2004 WL 2730104 (D. Minn. Nov. 19, 2004) ................................... 22

*Masters v. UHS of Del., Inc.*,
 631 F.3d 464 (8th Cir. 2011) ................................................................................... 22, 23

*Matthews v. Wozencraft*,
 15 F.3d 432 (5th Cir. 1994) ............................................................................................ 7

*Meadows v. Hartford Life Ins. Co.*,
 492 F.3d 634 (5th Cir. 2007) .......................................................................................... 7

*Michaels v. Internet Entm't Grp., Inc.*,
 5 F. Supp. 2d 823 (C.D. Cal. 1998) .............................................................................. 27

*Miller v. Glenn Miller Prods., Inc.*,
 454 F.3d 975 (9th Cir. 2006) ........................................................................................ 22

*Minn. Mining & Mfg. Co. v. Beautone Specialties, Co.*,
 82 F. Supp. 2d 997 (D. Minn. 2000) ............................................................................. 20

*Mut. of Omaha Ins. Co. v. Novak*,
 836 F.2d 397 (8th Cir. 1987) ........................................................................................ 18

*Newton v. Thomason*,
 22 F.3d 1455 (9th Cir. 1994) ........................................................................................ 24

*No Doubt v. Activision Publ'g*,
 702 F. Supp. 2d 1139 (C.D. Cal. 2010) ........................................................................ 27

*Nolde Bros., Inc. v. Local No. 3598, Bakery & Confectionary Workers Union*,
  430 U.S. 243 (1977) ................................................................................ 27

*Porous Media Corp. v. Pall Corp.*,
  173 F.3d 1109 (8th Cir. 1999) ................................................................ 11

*Preston v. Martin Bregman Prods., Inc.*,
  765 F. Supp. 116 (S.D.N.Y. 1991) ......................................................... 25

*Ray v. ESPN, Inc.*,
  No. 13-cv-1179, 2014 WL 2766187 (W.D. Mo. Apr. 8, 2014) ............... 25, 26

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
  487 U.S. 781 (1988) ................................................................................ 14

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) .................................................................... 16

*Somerson v. McMahon*,
  956 F. Supp. 2d 1345 (N.D. Ga. 2012) ................................................... 25

*Tellado v. Time-Life Books, Inc.*,
  643 F. Supp. 904 (D.N.J. 1986) ........................................................... 9, 10

*Uhlaender v. Henricksen*,
  316 F. Supp. 1277 (D. Minn. 1970) .......................................................... 8

*West v. Upper Miss. Towing Corp.*,
  221 F. Supp. 590 (D. Minn. 1963) .......................................................... 19

*Whitehurst v. Showtime Networks, Inc.*,
  No. 1:08-CV-47, 2009 WL 3052663 (E.D. Tex. Sept. 22, 2009) ............... 7

*Whitfield v. Anheuser-Busch, Inc.*,
  820 F.2d 243 (8th Cir. 1987) .............................................................. 18, 21

**STATE CASES**

*Beverley v. Choice Women's Med. Ctr., Inc.*,
  587 N.E.2d 275, 279 (N.Y. 1991) ............................................................ 5

*Bisbee v. John C. Conover Agency, Inc.*,
  452 A.2d 689 (N.J. Super. Ct. App. Div. 1982) ........................................ 9

*Castro v. NYT Television*,
  851 A.2d 88 (N.J. Super. Ct. App. Div. 2004) .......................................... 9

*Comedy III Prods. Inc. v. Gary Saderup, Inc.*,
    21 P.3d 797 (Cal. 2001) .................................................................................. 15

*Danforth v. Star Tribune Holdings Corp.*,
    No. A10-128, 2010 WL 4286242 (Minn. Ct. App. Nov. 2, 2010) ................................ 8

*Dora v. Frontline Video, Inc.*,
    18 Cal. Rptr. 2d 790 (Cal. Ct. App. 1993) ................................................. 6

*Fleet v. CBS, Inc.*,
    50 Cal. App. 4th 1911 (1996) ............................................................. 26

*Gautier v. Pro-Football, Inc.*,
    107 N.E.2d 485 (N.Y. 1952) .............................................................. 7

*Gionfriddo v. Major League Baseball*,
    114 Cal. Rptr. 2d 307 (Cal. Ct. App. 2001) ............................................. 6, 7

*Kimbrough v. Coca-Cola/USA*,
    521 S.W.2d 719 (Tex. Civ. App. 1975) ................................................... 7

*Lake v. Wal-Mart Stores, Inc.*,
    582 N.W.2d 231 (Minn. 1998) ............................................................ 8

*Messenger ex rel. Messenger v. Gruner Jahr Printing & Publ'g*,
    727 N.E.2d 549 (N.Y. 2000) ............................................................. 5

*Montana v. San Jose Mercury News, Inc.*,
    40 Cal. Rptr. 2d 639 (Cal. Ct. App. 1995) .............................................. 6

*Stephano v. News Grp. Publ'ns, Inc.*,
    474 N.E.2d 580 (N.Y. 1984) ............................................................. 5

**FEDERAL STATUTES**

15 U.S.C. § 1125(a) .......................................................................... 17

**OTHER AUTHORITIES**

Restatement (Second) of Torts ................................................................ 8

Restatement (Third) of Unfair Competition (1995) ........................................ 7, 13, 17

# INTRODUCTION

Plaintiffs have not identified a single disputed issue of material fact that precludes the entry of summary judgment for the NFL on any of its defenses. Instead of addressing the content of the particular NFL Films programs in which they appear or showing how that content uses their name and likeness to sell goods or services, Plaintiffs argue in generalities, as if this case remained at the Rule 12 stage and as a putative class action. On this summary judgment motion, however, only Plaintiffs' individual claims and the specific programs in which they appear are at issue. Their claims suffer from a complete failure of proof because, as Plaintiffs now concede, each of the challenged programs does no more than show Plaintiffs playing football games during their NFL careers.

First, the undisputed record shows that Plaintiffs' names and likenesses were used only in the context of sports or entertainment programming. That is a protected use under the safe harbors of every applicable state law, as well as under the Lanham Act. Plaintiffs' names and likenesses were not used to sell unrelated merchandise and services. For that reason alone, Plaintiffs have no claim.

Second, as this Court correctly anticipated in its Rule 12 decision, resolution of the "commercial-speech question" now is possible on the "developed record." *Dryer v. NFL*, 689 F. Supp. 2d 1113, 1119 (D. Minn. 2010). Plaintiffs have not identified any genuine dispute as to whether their names and likenesses were used in advertising—they were not. The only uses were in the programs, which have both historical and entertainment value, making them protected by the First Amendment. Plaintiffs ask this Court to hold that the programs are the constitutional equivalent of ads because they are so popular that

they enhance the NFL's brand.  No court ever has adopted that approach to defining commercial speech.  Applied to any media company, Plaintiffs' approach would strip First Amendment protection from much, if not all, of the company's content.  Any benefit generated by the programs is the direct result of, and inseparable from, their expressive content and does not change their fully-protected status.

Third, federal copyright law preempts Plaintiffs' state-law claims.  The record shows, and Plaintiffs concede, that the only uses of their identities they challenge are uses of recorded game footage in which they appear.  Because Plaintiffs challenge only the use of those copyrighted recordings, not any use of their identities apart from the recordings, their claims are preempted, as two recent decisions make clear.

Fourth, there is no factual dispute to preclude the Court's exercise of its discretion on the NFL's equitable defenses.  Plaintiffs knew that NFL Films was producing programs showing them; they never objected for more than 20 years; and they actively participated in making the programs.  That conduct, combined with the evidentiary and economic prejudice the NFL suffered as a result, establish laches and acquiescence.

Finally, Plaintiffs' arguments as to why their claims are not preempted under the LMRA only confirm why summary judgment should be granted.  It is undisputed that the parties disagree about the scope and duration of the publicity rights granted in Plaintiffs' contracts.  That requires those contracts to be interpreted, triggering preemption.

# ARGUMENT

## I. The Challenged Programs Are Protected By State Safe Harbors And The First Amendment.

Every fact material to the NFL's defenses under the state-law safe harbors, First Amendment, and Lanham Act is now undisputed. No state or federal law provides a cause of action against the NFL's accurate, historical use of its own game footage.

### A. The challenged programs and their contents are undisputed, and Plaintiffs cannot create a genuine issue of fact by citing unrelated raw-footage licenses.

The programs that Plaintiffs challenge are now undisputed. A copy of every one of the programs at issue is in the record. (*See* Connolly Exs. A-C, Dkt. 545-3.) Plaintiffs do not allege that any other speech is involved. (*See* Pl. Mem. 2, 19, Dkt. 540.)

The content of the speech is also undisputed. Plaintiffs concede that the programs contain game footage of "the Plaintiffs playing football." (Pl. Opp. 27, Dkt. 551.) Whether documenting the history of the sport, recapping a season, or revisiting significant games or plays, the programs tell stories about football that remain of great interest to the public.

That the programs have significant expressive value also is undisputed. They take some of the greatest moments from the history of the game, combine them with a "singular style of cinematography" and "orchestral music," and transform them into "movie[s]" and "drama[s]." (Gleason Ex. 5, NFL 00290348-49, Dkt. 541-3.) Anyone who watches them instantly understands why NFL Films has won more than 100 Emmys (Connolly Ex. R, Keller Rep. 27-28), and why "everyone in the sports and television

business" has tried to emulate their style.  (NFL Mem. 4, Dkt. 544.)  The programs are filmmaking at its finest.

Plaintiffs attempt to create fact issues, not by addressing the programs, but by citing NFL documents and testimony about a different, unrelated aspect of NFL Films' business—its licenses of raw game footage to third parties for the third parties' use.  That does not create a material fact dispute for two reasons.  First, Plaintiffs do not claim that the NFL violates their rights when it licenses raw footage to others.  They could not do so:  The licenses explicitly state that no player publicity rights are conveyed.  (*See* NFL Opp. 15-17, 30-31, Dkt. 549.)  Second, the licenses of raw footage to others have nothing to do with the NFL's programs, which are the only subject of Plaintiffs' suit.  (*Id.*) Appendices A and B (attached) address Plaintiffs' evidence piece by piece and demonstrate that none of it creates any disputed issue of material fact preventing summary judgment.

### B.  The challenged programs are protected by safe harbors in each state's right-of-publicity law.

On the undisputed factual record, the NFL is entitled to summary judgment under the safe harbors in each state's law.  (NFL Mem. 9-17.)  Plaintiffs do not dispute that the safe harbors exist to help distinguish between right-of-publicity uses and other uses of likenesses that are protected speech.  Nor do they dispute that speech about sports falls within the safe harbors.  Instead, Plaintiffs make two incorrect arguments.

First, they argue that the NFL cannot receive safe-harbor protection because its game footage is copyrighted.  Publishers universally copyright their news and

entertainment content and enforce those rights.  *See, e.g., Associated Press v. Meltwater U.S. Holdings, Inc.,* 931 F. Supp. 2d 537 (S.D.N.Y. 2013).  That does not make the content any less protected as expressive speech.  Plaintiffs cite no case in which a court declined to apply a safe harbor because the content was copyrighted.

Second, Plaintiffs argue that the programs are not protected by the safe harbors because, "when analyzing newsworthiness, the focus is on the *purpose* of the defendant's use." (Pl. Opp. 16 (emphasis added).)  That is wrong under every applicable state's law.

### 1. Programs showing Dryer – New York and California law.

#### a. New York law.

Under New York law (which governs Dryer's claims against the use of footage showing him as a Giant), "[i]t is the *content* of the article and *not* the defendant's motive … which determines whether it is a newsworthy item."  *Stephano v. News Grp. Publ'ns, Inc.*, 474 N.E.2d 580, 585 (N.Y. 1984) (emphasis added).  "Whether an item is newsworthy depends *solely* on the content of the [publication]—*not* the publisher's motive to increase circulation."  *Messenger ex rel. Messenger v. Gruner Jahr Printing & Publ'g*, 727 N.E.2d 549, 552 (N.Y. 2000) (emphasis added; quotation marks omitted).  Plaintiffs cite *Beverley v. Choice Women's Medical Center, Inc.*, but that case applied the safe harbor on content alone.  587 N.E.2d 275, 279 (N.Y. 1991) (holding that challenged calendar, "on its face, was an advertisement").

Because the *content* of the challenged programs shows athletic performances by Dryer that were widely televised, the programs are protected.  Plaintiffs do not even mention, let alone distinguish, the many cases holding that New York's safe harbor

applies broadly to matters of entertainment and amusement, including speech about NFL football games.  (NFL Mem. 13-14 (citing cases); Pl. Opp. 16-17.)  The NFL is entitled to summary judgment.

### b.    California law.

Plaintiffs' arguments that the California safe harbor does not protect speech produced for "commercial gain," and that it applies only to current, hard "news," are inconsistent with the cases addressing speech about sports.  (Pl. Opp. 11-14.)  *See Gionfriddo v. Major League Baseball*, 114 Cal. Rptr. 2d 307 (Cal. Ct. App. 2001) (films about historic MLB games and players); *Montana v. San Jose Mercury News, Inc.*, 40 Cal. Rptr. 2d 639 (Cal. Ct. App. 1995) (souvenir posters of Joe Montana for sale); *Dora v. Frontline Video, Inc.*, 18 Cal. Rptr. 2d 790 (Cal. Ct. App. 1993) (documentary containing old surfing footage).  In none of those cases was the speech "hard news."  In every case it was produced for a commercial purpose, whether to "promote the product of baseball," as in *Gionfriddo*, 114 Cal. Rptr. 2d at 311, to "advertise the quality and content of [a] newspaper," as in *Montana*, 40 Cal. Rptr. 2d at 643, or to profit from a documentary, as in *Dora*, 18 Cal. Rptr. 2d at 791.  Yet in every case, the court applied the safe harbor.  (NFL Mem. 10-13.)

Plaintiffs do not dispute that these cases accurately state California law, and they cannot distinguish them—particularly *Gionfriddo*, which this Court acknowledged is "directly analogous to this case."  *Dryer*, 689 F. Supp. 2d at 1117.  Although the Court did not apply *Gionfriddo* at the Rule 12 stage, it controls the California state-law issues at summary judgment.  Like the video in *Gionfriddo*, the challenged programs use "video

clips taken of plaintiffs when they were playing the game" and "present[] historic events from long ago." *See* 114 Cal. Rptr. 2d at 314. The programs are protected by California law.

### 2. Programs showing Bethea – Texas law.

Contrary to Plaintiffs' arguments, the Texas safe harbor is not limited to hard news, and courts do not withdraw protection from newsworthy content based on the speaker's purpose. (Pl. Opp 14-15.) "Texas courts rely on the Restatement as the definitive source of guidance in cases involving invasion of the right of privacy," *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 638 (5th Cir. 2007) (quotation marks omitted), and the Restatement applies the newsworthiness exemption, not just to "news reporting," but also to "commentary, entertainment, [and] works of fiction or non-fiction." *See* Restatement (Third) of Unfair Competition § 47 (1995). Even fictionalized accounts of newsworthy events, produced for commercial gain, are protected by Texas law. *See Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994) (book); *Whitehurst v. Showtime Networks, Inc.*, No. 1:08-CV-47, 2009 WL 3052663, at *6 (E.D. Tex. Sept. 22, 2009) (film).

In applying the safe harbor, Texas courts focus on the *content* of the challenged speech. *See Kimbrough v. Coca-Cola/USA*, 521 S.W.2d 719, 721 (Tex. Civ. App. 1975) (question is whether use is "a form of treatment distinct from the dissemination of news or information") (quoting *Gautier v. Pro-Football, Inc.*, 107 N.E.2d 485 (N.Y. 1952)); *see also Matthews*, 15 F.3d at 439 (distinguishing between uses in "motion picture [or] news or entertainment story" versus "in advertising"). Moreover, a defendant's intent to

profit does not transform newsworthy speech into a right-of-publicity violation. Restatement (Second) of Torts § 652C cmt. d (1977) (that "defendant is engaged in the business of publication, … out of which he … seeks to make a profit, is not enough").

Because the challenged programs show athletic performances by Bethea that were widely televised, they are protected by Texas law.  (*See* NFL Mem. 15-16.)

### 3. Programs showing White – California and Minnesota law.

Although Minnesota courts have not yet addressed the newsworthiness protection, they, too, would follow the principles articulated in the Restatement and case law discussed above.  *See, e.g.*, *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233-36 (Minn. 1998) (recognizing the invasion-of-privacy tort, relying on Restatement (Second) of Torts); *see also Danforth v. Star Tribune Holdings Corp.*, No. A10-128, 2010 WL 4286242, at *4-5 (Minn. Ct. App. Nov. 2, 2010) (reporting on matters of public interest protected against privacy-related claims).  Plaintiffs cite *Uhlaender v. Henricksen*, 316 F. Supp. 1277 (D. Minn. 1970), but that case did not mention, let alone analyze, the newsworthiness safe harbor or related First Amendment issues.  The controlling cases on the protected quality of the speech are the more recent decisions in *CBS Interactive Inc. v. National Football League Players Ass'n, Inc.*, 259 F.R.D. 398 (D. Minn. 2009), and *C.B.C. Distribution & Marketing, Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818 (8th Cir. 2007), which address the same type of uses that were at issue in *Uhlaender*, but hold them to be protected.

The programs showing White in a Minnesota Vikings uniform recount historic performances that Vikings fans discuss to this day and are thus protected speech.

### 4. New Jersey law – no Plaintiff.

The Court should not apply New Jersey law to any of Plaintiffs' right-of-publicity claims. (*See* NFL Mem. 9 (addressing choice-of-law).) Plaintiffs' choice-of-law discussion cites no record support, misapplies the choice-of-law factors, and fails to explain how their position is consistent with their complaint, which invokes the laws of many states. (Pl. Opp. 17-21; *see also* Final Approval Order 9-10, Dkt. 431.)

New Jersey law, however, also protects the programs. Newsworthiness in New Jersey covers "all events and items of information which are out of the ordinary humdrum routine, and which have 'that indefinable quality of information which arouses public attention,'" *Bisbee v. John C. Conover Agency, Inc.*, 452 A.2d 689, 693 (N.J. Super. Ct. App. Div. 1982), including television programs "that provide[] only entertainment and amusement," *Castro v. NYT Television*, 851 A.2d 88, 97 (N.J. Super. Ct. App. Div. 2004).

Plaintiffs incorrectly cite *Tellado v. Time-Life Books, Inc.*, 643 F. Supp. 904 (D.N.J. 1986), for the proposition that a commercial purpose removes otherwise-protected content from the safe harbor. (Pl. Opp. 10-11.) To the contrary, *Tellado* states that content having a "redeeming public interest, news, or historical value" is protected and emphasizes that "[a] profit motive alone does *not* suffice" to prove a violation, since "many nontortious uses of someone's likeness result in profits for their promoters." 643 F. Supp. at 910 (emphasis added). *Tellado* also addressed a factually inapposite situation: The plaintiff's likeness was used to advertise a book series but never appeared in the content of the advertised books. *Id.* Here, Plaintiffs' likenesses were not used anywhere

other than in the content of the programs.  That use is protected because it has

"redeeming public interest, news, or historical value."  *Id.*

### C.  The challenged programs are protected by the First Amendment, barring Plaintiffs' right-of-publicity claims.

The First Amendment provides another independent ground for granting summary

judgment to the NFL.  (NFL Mem. 18-34; NFL Opp. 4-23.)

### 1.  The challenged programs cover events of great public interest and thus receive full First Amendment protection.

Plaintiffs do not dispute that speech about professional sports has received full

First Amendment protection by every court to address the issue due to the overwhelming

public interest it commands.  (*See* NFL Mem. 19-23 (citing cases).)  They also do not

dispute that the content of the challenged programs places them directly within these

precedents.  (*See* NFL Mem. 21-23; NFL Opp. 5; *see also* Connolly Exs. 1-8 (attaching

examples of speech held to be protected).)  Any such dispute, moreover, would be

pointless.  The programs are in the record, and the Court can see that they consist entirely

of stories about classic NFL games, teams, seasons, and players.  When Plaintiffs appear

in the programs, "the footage itself continues to depict" them as they originally appeared

before the public:  "playing football."  (Pl. Mem. 19.)  The programs are entitled to the

highest level of First Amendment protection.

### 2.  The challenged programs are not commercial speech.

Plaintiffs never address, let alone explain how the programs meet, the Supreme

Court's tests for commercial speech.  That the programs are not commercial speech under

those tests stands unrebutted.  (*See* NFL Mem. 26-27; NFL Opp. 6-7.)  This alone is a basis for ruling for the NFL.

>**a.      The *Porous* factors reinforce the conclusion that the programs are not commercial speech.**

Plaintiffs argue that the programs are commercial speech because they meet all three factors listed in *Porous Media Corp. v. Pall Corp.,* 173 F.3d 1109 (8th Cir. 1999).  That is incorrect.  (*See* NFL Mem. 27-32; NFL Opp. 7-19.)

The programs do not satisfy the first *Porous* factor because they are sports programming, not advertisements, and they bear no resemblance to the materials that the Eighth Circuit and Supreme Court have found to be ads.  In *Porous*, the materials at issue urged consumers "to buy Pall's filter and not to buy Porous's … by specific reference to both products."  173 F.3d at 1121.  In *Bolger v. Young's Drug Products Corp.,* the mailings for condoms included pictures of the condom packages, and Young's Drug conceded they were advertisements.  463 U.S. 60, 66 (1983).  (*See also* Connolly Exs. 9-10 (attaching copies of the speech found to be ads).)

The second factor asks whether the speech identifies a specific, separate product consumers can purchase.  None of the programs mentions any product available for purchase.  To the contrary, the programs *are* the products, which broadcasters pay to air and consumers can buy on DVDs.  (*See* NFL Opp. 17-19.)  The record is undisputed on this point:  The programs are content into which broadcasters insert other companies' advertisements.  (*See* NFL Mem. 28.)

Simply put, the *Porous* factors reinforce the conclusion that the challenged programs are not commercial speech.

   **b.**  **Sports programming does not become an advertisement because it has the purpose or effect of enhancing the brand of its producer.**

Without any case support, Plaintiffs make the unprecedented argument that sports programming should be treated as the constitutional equivalent of advertising if its popularity enhances the speaker's brand. (Pl. Opp. 23-26.) That argument has no legal basis and is grossly overbroad. (*See* NFL Opp. 8-11.)

The testimony of Plaintiffs' expert does not create any disputed issue of material fact. He did not, as Plaintiffs assert, characterize the challenged programs simply as "advertising." (Pl. Opp. 23.) He labeled them, in a portion of his declaration that Plaintiffs omit, as a form of "branding." (Connolly Ex. 24, Fallon Report at 1, 10.) At his deposition, moreover, he disavowed even that qualified statement, admitting that not all branding is the same as advertising. (Connolly Ex. 15, Fallon Dep. 227:25-230:24, 277:6-284:9, 315:10-317:7, 405:11-22.). There is no genuine dispute on this point. (*See* NFL Mem. 27-29; NFL Opp. 9-11.) Great customer service builds a brand but is not advertising. Popular products can also build a brand but are not advertising. That the challenged programs are highly popular does not make them ads.

The handful of internal NFL documents from which Plaintiffs selectively quote do not equate the programs to ads. (Pl. Mem. 13; Pl. Opp. 23-25.) To the contrary, they say that the value delivered by NFL Films programs is as great as an enormous ad budget. That is not disputed. Because of their popularity, NFL Films programs are viewed by

more people than all but the largest of ad campaigns. (NFL Opp. 11.) That establishes nothing, however, about the programs' content and has nothing to do with whether the programs are ads. They are not; they are sports programs.

The other documents do not say anything different. The same document quoting a Sports Illustrated article describing NFL Films as an "effective propaganda organ" explains that, to the extent the description is accurate, it is because the programs are so well made. (Gleason Ex. 5.) If the particular programs in which *Plaintiffs* appeared have provided any promotional benefit to the NFL—an issue on which Plaintiffs offer no proof—it is not because they propose a commercial transaction or use Plaintiffs' names and likenesses to sell merchandise. It is because they are of such exceedingly high quality. That is not a reason to strip them of their First Amendment protection.

In addition to the other examples of how protected content can have a promotional impact on the speaker's brand (*see* NFL Opp. 10), consider a newspaper reporting on its own awards. *See, e.g.*, "StarTribune wins award for Best Buy coverage" (June 25, 2013); "StarTribune wins 2 Pulitzers" (April 16, 2013) (attached as Connolly Ex. 25). The award-winning articles themselves, as well as the articles about those awards, directly enhance the StarTribune's brand but are protected under the First Amendment. As the Restatement puts it: "That the publisher or other user … is successful in obtaining a commercial advantage" from the use of the likeness does not make the use actionable. Restatement (Third) of Unfair Competition § 47, cmt. c. Plaintiffs accept the Restatement as authoritative in other contexts. (*See* Pl. Opp. 5-6.) The Court should follow it here.

### 3. Any brand-enhancing effect of the programs is inextricably intertwined with their expressive elements.

Rather than help Plaintiffs, the documents acknowledging the promotional value of NFL Films programs serve only to place the programs squarely within the Supreme Court's inextricably intertwined doctrine, which Plaintiffs ignore. In *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781, 796 (1988), the Court held that content with commercial elements remains fully protected if those elements are "inextricably intertwined," meaning they cannot be separated from, the expressive speech. (*See* NFL Mem. 33 (collecting cases).) That describes the programs, and the documents and testimony on which Plaintiffs rely make that very point. (*See*, *e.g.*, Pl. Opp. 3, 24-25.) It is undisputed that any enhancement of the NFL brand is a direct result of telling high-quality stories about the games. Even under Plaintiffs' theory, any commercial aspects are inseparable from the protected content. (*See* NFL Opp. 6-7.) Under *Riley*, the full programs must be given First Amendment protection.

### 4. First Amendment interests outweigh Plaintiffs' right-of-publicity interests, particularly since Plaintiffs benefitted from the programs.

Under the controlling Eighth Circuit standard set forth in *C.B.C.*, the First Amendment interests in protecting the programs' expressive content far outweigh any of Plaintiffs' economic interests protected by state-law rights of publicity. (NFL Mem. 24-26; NFL Opp. 19-23.) *C.B.C.* held that the First Amendment interests inherent in using player names and statistics in a paid fantasy baseball game outweighed the professional baseball players' publicity rights. 505 F.3d at 824. It follows that the First Amendment

interests in showing players in sports programs about football games also prevail. (NFL Opp. 22.)

Plaintiffs neither discuss *C.B.C.*'s balancing test nor identify a single fact showing any harm to their economic interests. (Pl. Mem. 16-17.) Far from being harmed, Plaintiffs *benefitted* from appearing in the programs (NFL Mem. 25-26), something they do not dispute. That decisively tips the balance toward protecting the programs.

The transformative-use test Plaintiffs advocate is not the Eighth Circuit's test and should not be applied. (*See* NFL Opp. 20-22; *see also* Pl. Mem. 17 n.1 (conceding that the Eighth Circuit has not adopted the test).) Plaintiffs also do not accurately describe it. It does not, as Plaintiffs suggest, require one to "transform" a plaintiff's "likeness." (Pl. Opp. 26; Pl. Mem. 17.) The same decision that created the test "emphasize[d]" that First Amendment interests could prevail over a right-of-publicity claim even in a case of "factual reporting." *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 809 (Cal. 2001). It makes no sense to suggest that otherwise accurate factual reports require distorting reality to be protected. Neither *Comedy III* nor any other case involving "biographies, documentaries … and other expressive works depicting real-life figures" so holds. *See Hart v. Elec. Arts, Inc.,* 717 F.3d 141, 165 (3d Cir. 2013).

The fundamental inquiry under the transformative-use test is not whether the plaintiff's likeness itself is transformed, but whether the marketability of the work derives from factors beyond those arising from the commercial appeal of the likeness. *Comedy III*, 21 P.3d at 809. That is the case here, where the marketability of the challenged programs arises from many factors other than the three Plaintiffs' identities. The

programs are compelling accounts of actual NFL football games. By definition, they include other significant elements, such as the outcome of the game itself, the likenesses of other players, and the value added by NFL Films. As courts repeatedly have held, and as this District recognized in an analogous case, there is "no dispute" that the public is "fascinated" with sporting events, not just individual player identities or statistics. *CBS Interactive*, 259 F.R.D. at 419. Even under the transformative-use test, the NFL is entitled to summary judgment.

### D. The challenged programs are protected speech under the Lanham Act.

In its Rule 12 decision, this Court correctly anticipated that "[i]t may be that discovery will show that there is no … explicit misleading" statement in any of the programs. *Dryer*, 689 F. Supp. 2d at 1122. That is exactly what the undisputed record now shows. Plaintiffs' Lanham Act claims fail as a result. (NFL Mem. 35-37.)

Plaintiffs do not dispute that the Eighth Circuit will adopt and apply the test in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), to Lanham Act claims brought against expressive speech. Indeed, Plaintiffs rely on *Anheuser Busch, Inc. v. Balducci Publications,* 28 F.3d 769, 776-77 (8th Cir. 1994), where the Eighth Circuit repeatedly cited the test developed in *Rogers* "to weigh the public interest in free expression." Plaintiffs also do not dispute that their claims fail under *Rogers*. The NFL is therefore entitled to summary judgment. (*See* NFL Mem. 35-37.)

Plaintiffs argue that *Rogers* does not apply because the programs are not expressive works (Pl. Opp. 31), but that is wrong for all the reasons given above. Plaintiffs also argue that the NFL had "sufficient alternative means" to convey the

expression contained in game footage. (*See id.*) That makes no sense. There is no way to show historic games and plays other than by showing the historic games and plays. The first prong of the *Rogers* test asks whether the use of the plaintiff's likeness is relevant to the topic addressed by the speech. Here, that prong is satisfied because, when accurately depicting games, there literally is no alternative means than to show the people who played in them. Cases like *Brown v. Electronic Arts, Inc.,* 724 F.3d 1235 (9th Cir. 2013), which addressed the alleged use of Jim Brown's likeness in a video game, illustrate the correct and only workable approach. (*See* NFL Mem. 36-37.)

      *Brown* also shows that Plaintiffs' Lanham Act claims fail the second prong of the *Rogers* test because the programs do not contain any false or misleading statement that is likely to cause confusion in a purchasing situation.[1] 15 U.S.C. §1125(a); Restatement (Third) of Unfair Competition § 20, Rptr. Note cmt. b (only purchasing-related confusion matters, not confusion generally). Moreover, because the programs are expressive speech, the second prong of the *Rogers* test requires the alleged misrepresentation to be express, not implied. *See Brown*, 724 F.3d at 1245. Plaintiffs admit that the programs do no more than show them playing football. (Pl. Mem. 2, 19.) This dooms their Lanham Act claims, distinguishing this case from the misleading movie title in *American Dairy*

---

[1] Plaintiffs cite *Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959 (10th Cir. 1996), for the proposition that the likelihood-of-confusion test resolves all First Amendment concerns and makes *Rogers* unnecessary. (Pl. Opp. 30.) In fact, *Cardtoons* made that statement in describing the effect of a "good … parody" because such a parody makes confusion so unlikely. *Id.* at 970-71. Plaintiffs' citation to *Films of Distinction, Inc. v. Allegro Film Products, Inc.,* 12 F. Supp. 2d 1068, 1078 (C.D. Cal. 1998), is similarly incomplete. The decision turns on the district court's erroneous belief that "the Ninth Circuit will not adopt" *Rogers*, which it later did. *See Brown*, 724 F.3d at 1239.

*Queen Corp. v. New Line Products*, 35 F. Supp. 2d 727, 732 (D. Minn. 1998) (title expressly communicated likelihood of confusion as to film's source), and the misleading logos emblazoned on t-shirts in *Mutual of Omaha Insurance Co. v. Novak*, 836 F.2d 397, 401 (8th Cir. 1987).

## II. The NFL's Equitable Defenses Bar Plaintiffs' Claims.

Plaintiffs do not dispute either the material facts about their own conduct or that the NFL's equitable defenses are for the Court, not a jury, to decide. The equitable defenses thus provide another basis for summary judgment.

### A. The material facts of Plaintiffs' knowledge, delay, and active support for the challenged programs are undisputed.

The material facts of Plaintiffs' conduct that support the NFL's equitable defenses are undisputed: (i) Plaintiffs knew early in their retirements that the NFL was continuing to use game footage of them in programs (NFL Mem. 39-40); (ii) they never objected for more than 20 years (NFL Mem. 39-40); and (iii) beyond failing to object, they willingly sat for interviews and thanked the NFL for including them in the programs. (NFL Mem. 43-44.)

### B. That the NFL's equitable defenses are for the Court to decide is also undisputed.

It is also undisputed that the NFL's equitable defenses are for the Court to decide. "Whether laches should apply is a matter within the sound discretion of the trial court." *Whitfield v. Anheuser-Busch, Inc.*, 820 F.2d 243, 245 (8th Cir. 1987); *see also Jones v. Boyd Transfer & Storage Co.*, 323 F.2d 998, 1004 (8th Cir. 1963) (same).

**C. Plaintiffs' claims are equitably barred.**

On the undisputed facts, it lies well within the Court's equitable discretion to grant summary judgment for the NFL.

### 1. Ignorance of the law is no defense to Plaintiffs' decades-long delay.

First, Plaintiffs' decades-long delay is more than enough to support laches. (*See* NFL Mem 39-41.)

Trying to shorten the delay, Plaintiffs argue that the clock started running, not when they first learned of NFL Films' use of game footage of them, but on some later, unspecified date when they first came to believe that they "possessed rights in their images violated by the NFL's conduct." (Pl. Opp. 38.) That is incorrect, because "[c]ourts uniformly hold that ignorance of the law is not a sufficient excuse to allow maintenance of stale claims." *West v. Upper Miss. Towing Corp.*, 221 F. Supp. 590, 592 (D. Minn. 1963) (Devitt, J.); *see also Alexander v. Phillips Petroleum Co.*, 130 F.2d 593, 606 (10th Cir. 1942) ("[I]gnorance of the law … will not ordinarily excuse delay in asserting the claim."); *Citizens & Landowners Against Miles City/New Underwood Powerline v. Sec'y, U.S. Dept. of Energy*, 683 F.2d 1171, 1175 (8th Cir. 1982) (measuring delay from when plaintiffs "first learned of [defendant's] proposal").

*Halstead v. Grinnan*, 152 U.S. 412 (1894), does not establish a different rule. There, the Court applied laches to bar the claim of a plaintiff who had known for over two decades of the facts underlying his claim, concluding that it would be "difficult to find a clearer case of ample and long-continued knowledge of the exact situation." *Id.*

19

at 423.  That applies with equal force here.  Measuring Plaintiffs' delay "from the time [they] became aware that [the NFL] began" showing the challenged programs, *Minn. Mining & Mfg. Co. v. Beautone Specialties, Co.*, 82 F. Supp. 2d 997, 1003-04 (D. Minn. 2000), it is clear that the first element of laches is satisfied.  (*See* NFL Mem. 39-41.)

The undisputed record also shows that Plaintiffs knew they had publicity rights even before they retired.  Each signed multiple contracts granting the NFL "the authority to use his name and picture for publicity and promotional purposes."  (Connolly Ex. AA; *see also* NFL Mem 57-58 (citing contracts for each Plaintiff).)  Plaintiffs cannot simultaneously argue that they have a claim because everyone supposedly understood that their grant of publicity rights ended on retirement, but also that their decades of delay should be excused because they were unaware of those rights.  (Pl. Mem 26.)  The record establishes the first element of the NFL's defenses of laches and acquiescence.

## 2. There is ample evidence of prejudice caused by Plaintiffs' inexcusable delay.

The undisputed record also establishes that the NFL suffered prejudice.  As an initial matter, where the delay is lengthy, "less proof of prejudice will be required." *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 807 (8th Cir. 1979).  The NFL easily meets the standard.

First, the NFL suffered evidentiary prejudice in the form of impaired witness memories.  That alone is sufficient to find laches.  In one case, for example, the Eighth Circuit held that, "[b]ased on the impaired recollection of Anheuser-Busch's two key witnesses, we agree with the district court's finding that Anheuser-Busch was

prejudiced." *Whitfield*, 820 F.2d at 246. In another, the Eighth Circuit repeated that, "in light of the number of witnesses who have testified that they cannot remember details about plaintiff's employment," the defendant "had sufficiently demonstrated prejudice." *Brown-Mitchell v. Kansas City Power & Light Co.*, 267 F.3d 825, 828 (8th Cir. 2001).

The record of evidentiary prejudice to the NFL is far stronger than in either *Whitfield* or *Brown-Mitchell*. Plaintiffs here delayed more than twice as long as the plaintiffs in *Whitfield* (ten years) or *Brown-Mitchell* (eight years). Not just one or two witnesses, but multiple witnesses for all parties testified as to memory loss. (*See, e.g.*, Connolly Exs. 16-23, Katz Dep. 144:12-13 ("I would have to try to remember what I meant by this seven years ago."), 159:19-160:1, 161:12-16; Wolper Dep. 129:5-12 ("I don't remember anything about this."), 150:16-21, 164:3-11; Driber Dep. 46:20 ("I don't remember."), 33:21-23, 64:16-18; Endres Dep. 56:8 ("I don't remember."), 60:13-24, 115:2-5; Sponaugle Dep. 20:9-12 ("I don't remember anything specific."), 22:19-24, 24:2-6; Dryer Dep. 55:15-56:2 ("These are contracts that I signed into a long time ago. I don't want to speculate on anything that I signed 42 years ago."), 45:5-12, 215:2-8; Bethea Dep. 23:1 ("I don't remember, no. It's 20, 30 years ago."), 33:24, 127:15-24; White Dep. 254:7-12 ("I don't even remember what it was … that was a long time ago."), 19:23-20:2, 228:25-229:9.)

The undisputed record also establishes economic prejudice. Because Plaintiffs never objected to the NFL's use of game footage of them in the programs, NFL Films continued making programs including them. (*See, e.g.*, Connolly Ex. A, Nos. 30 and 37 (including Dryer in programs created in 2005 and 2006); Connolly Ex. B, No. 29

(including Bethea in program created in 2006); Connolly Ex. C, No. 40 (including White

in program created in 2004); *see also* Connolly Ex. 16, Katz Dep. 11:4-7 ("We have built

an entire business by assuming, presuming for the last 40, 50 years, that we had those

rights.").)  Had Plaintiffs "pressed [their] claims in a timely manner," *Hot Wax, Inc. v.*

*Turtle Wax, Inc.*, 191 F.3d 813, 824 (7th Cir. 1999), the NFL could have avoided using

game footage of Plaintiffs and avoided the economic prejudice it now faces.  *See Miller*

*v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 999 (9th Cir. 2006) (economic prejudice

based on "enter[ing] into business transactions"); (NFL Mem. 41.).[2]

### 3. Plaintiffs' support of and participation in the programs establish acquiescence.

The undisputed record also shows that Plaintiffs welcomed and supported their

appearances in the programs, establishing that Plaintiffs' claims are barred by

acquiescence in addition to laches.  (*See* NFL Mem. 43-44.)

Acquiescence does not apply only where parties "actively represent[] that they

would not assert their legal rights."  (Pl. Opp. 41.)  It applies where, "through affirmative

word or deed, [the parties] expressly or impliedly consent[ed] to the infringement."

*Masters v. UHS of Del., Inc.*, 631 F.3d 464, 469 (8th Cir. 2011).  *Lutheran Association*

predated *Masters* and involved an inapposite set of facts, where the plaintiff demanded

that defendant "cease using the marks" and continued to "maintain[] that it owned the

marks" until it filed suit.  *Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n*

---

[2] *Miller* holds that laches bars all claims for relief, whether legal or equitable.  454 F.3d at 981 (affirming summary judgment dismissing all such claims based on delay).  Plaintiffs are wrong when they argue otherwise.  (Pl. Opp. 33 n.8.)

*of Missionaries & Pilots, Inc.*, No. 03-cv-6173, 2004 WL 2730104, at *11 (D. Minn. Nov. 19, 2004).

Plaintiffs also fail to distinguish *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145 (5th Cir. 1985). They argue *Conan* is different because the plaintiff there "directly communicated his approval of the allegedly infringing conduct to the defendant" by wishing the defendant success, getting a photo taken with the defendant, and sending a signed copy of the photo. (Pl. Opp. 41.) Plaintiffs did the same here. Dryer sat for four separate interviews with NFL Films, declared on camera from his garden that the programs were a "validation" of his "football career," and sat in his friend's house being recorded watching and commenting on programs in which he appeared. (NFL Mem. 43-44.) Bethea sat for three interviews with NFL Films, knowing they were for programs in which game footage of him would be used. (*Id.*) White sat for at least one NFL Films interview before filing suit and contacted the NFL to ask for replacement copies of programs destroyed in a fire—some of the very programs over which he would later sue. (*Id.*)

In short, for more than 20 years, Plaintiffs communicated to the NFL, "through affirmative word or deed, [that they] expressly or impliedly consent[ed] to the infringement." *Masters*, 631 F.3d at 469.

### 4. The NFL comes to the Court with clean hands.

To escape the consequences of their delay, Plaintiffs claim that the NFL comes to the Court with unclean hands, based on a purported admission by the NFL that it always knew it lacked the necessary publicity rights to use game footage in NFL Films

programs.  (*See* Pl. Opp. 38-40.)  This argument, first raised in Plaintiffs' summary

judgment motion (Pl. Mem. 27-28), is demonstrably incorrect.  (NFL Opp. 30-31.)  The

NFL has consistently stated that it does not have the right, either for itself or for others, to

use players' images in a way that would constitute an endorsement of a third-party

commercial product, but that it *does* have the right to use them in NFL Films programs

about NFL football.  Plaintiffs' outright misrepresentation to the contrary cannot create

any genuine factual dispute.

### D.  Plaintiffs' state-specific arguments are unfounded.

Apart from their erroneous, general arguments that ignore the undisputed facts,

Plaintiffs offer scarcely any arguments specific to any state law.  (*See* NFL Mem. 45-50.)

The few they do raise are unpersuasive.

First, Plaintiffs are wrong when they argue in a single, unsupported sentence that

the factual record does not establish implied consent for Dryer and White under

California law.  (Pl. Opp. 43.)  Plaintiffs do not even attempt to distinguish the cases

applying the defense to directly analogous factual situations in which, although plaintiff

"never uttered the words, 'I consent,' it is obvious that he did consent."  *Newton v.*

*Thomason*, 22 F.3d 1455, 1461 (9th Cir. 1994).  (*See also* NFL Mem. 45-46 (citing

cases).)  The defense of implied consent applies.

Second, Plaintiffs are wrong to argue New York's incidental-use doctrine does not

apply to a film showing Dryer in the background for two seconds.  Dryer's fleeting

appearance "contributes nothing of significance to the [program's] story line" and does

not play any meaningful role "in the main purpose and subject of the" program. *Preston v. Martin Bregman Prods., Inc.*, 765 F. Supp. 116, 119 (S.D.N.Y. 1991).

Third, Plaintiffs also do not dispute that their unjust enrichment claims are tied to, and derive from, their publicity-rights claims. (Pl. Opp. 49.) The unjust enrichment claims therefore fail along with the other claims. (NFL Mem. 55.)

## III.    Plaintiffs' State-Law Claims Are Preempted By The Copyright Act.

The undisputed record also supports judgment for the NFL on the basis of copyright preemption. (NFL Mem. 50-54; NFL Opp. 23-27.) Plaintiffs concede that their right-of-publicity claims are based solely on the NFL's use of copyrighted recordings to depict them "playing football." (Pl. Mem. 2, 19.) That places them squarely within the Copyright Act's preemption provisions. The recent decisions in *Ray* and *Somerson* consider and reject all of the arguments that Plaintiffs now raise and cannot be distinguished. *See Ray v. ESPN, Inc.*, No. 13-cv-1179, 2014 WL 2766187, at *2-5 (W.D. Mo. Apr. 8, 2014); *Somerson v. McMahon*, 956 F. Supp. 2d 1345, 1353-56 (N.D. Ga. 2012). (*See also* Connolly Exs. 11-14 (attaching copies of videos at issue in those cases).)

First, *Ray* and *Somerson* reject the argument that right-of-publicity claims with respect to *recordings* are immune from preemption because the original, *live* performances cannot be copyrighted. Recorded performances are "works" within the subject matter of copyright. *Ray*, 2014 WL 2766187, at *2 (video performances "within the subject matter of copyright"); *Somerson*, 956 F. Supp. 2d at 1354 ("video recordings of plaintiff's wrestling performance" meet the subject-matter requirement). Plaintiffs'

arguments about the differences between live professional wrestling and live professional football are thus irrelevant.  The nature of the sport does not determine whether copyright protection applies.  The fact that a copyrighted *recording* is involved does.  The first requirement for preemption is satisfied.  (*See* NFL Mem. 52; NFL Opp. 26.)

Second, like the plaintiffs in *Ray* and *Somerson*, Plaintiffs argue that they are only challenging the NFL's uses of their likenesses, not the use of recordings of game footage containing those likenesses.  *See, e.g., Ray*, 2014 WL 2766187, at *3 (characterizing object of suit as "not the actual video reproductions but the usage of his image, likeness and persona in the video reproductions").  *Ray* rejected this argument, reasoning that "Plaintiff's wrestling performances were part of the copyrighted material, and his likenesses could not be detached from the copyrighted performances that were contained in the films."  *Id.* at *5.  It concluded, "A claim asserted to prevent nothing more than the reproduction, performance, distribution, or display of a dramatic performance captured on film is subsumed by copyright law and preempted."  *Id.* (quoting *Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911, 1924 (1996)).  Plaintiffs challenge only the NFL's use of copyrighted footage.  Their right-of-publicity claims are therefore equivalent to the NFL's exclusive rights under copyright.  The second requirement for preemption is satisfied.  (*See* NFL Mem. 53; NFL Opp. 26.)

Plaintiffs cite cases that reach a different result, but that is because those cases addressed materially different facts.  In one, the defendant's use was not based on any recording, but on the incorporation of a computer-generated likeness of plaintiff into a video game. The court distinguished that from a defendant's use of an authorized

recording of a performance. *See No Doubt v. Activision Publ'g*, 702 F. Supp. 2d 1139, 1146-47 (C.D. Cal. 2010). In the other, *Michaels v. Internet Entm't Grp., Inc.*, 5 F. Supp. 2d 823 (C.D. Cal. 1998), plaintiffs appeared in a video (in which they held the copyright), but their right-of-publicity claim was based entirely on the defendant's use of their names and likenesses, wholly apart from the video's contents, to advertise the video. *Id.* at 837. Neither case involved a right-of-publicity claim against a defendant using a recorded performance in which it owned the copyright.

Plaintiffs concede that the challenged programs use game footage simply to "depict former NFL players—including Plaintiffs—playing football." (Pl. Mem. 2.) That makes it clear they are basing their claim not on a non-copyrightable *persona*, but on a copyrightable recording of a performance in which they appear. The principles in *Ray* and *Somerson* are controlling. Plaintiffs' claims are preempted.

## IV. The LMRA Preempts Plaintiffs' State-Law Claims.

Because Plaintiffs' claims require their player contracts to be interpreted, the claims are preempted by the LMRA. Plaintiffs' argument that the LMRA applies only if there is a collective bargaining agreement "currently in place" has been directly rejected by the Supreme Court. In a case Plaintiffs fail to cite, much less distinguish, the Supreme Court held that a claim was preempted "based on [the parties'] differing perceptions of a provision of [an] expired collective-bargaining agreement." *Nolde Bros., Inc. v. Local No. 3598, Bakery & Confectionary Workers Union*, 430 U.S. 243, 249 (1977). There is no escaping the need to interpret the player contracts to resolve Plaintiffs' claims and thus no escaping preemption under settled law. (NFL Mem. 55-59; NFL Opp. 27-34.)

## <u>CONCLUSION</u>

The Court should grant summary judgment for the NFL.


Dated: September 19, 2014

                                     *s/ Daniel J. Connolly*
                                     David J.F. Gross (#208772)
    Daniel J. Connolly (#197427)
    Aaron D. Van Oort (#315539)
    Eileen M. Hunter (#0336336)
    FAEGRE BAKER DANIELS LLP
    2200 Wells Fargo Center
    90 South Seventh Street
    Minneapolis, MN 55402
    (612) 766-7000

    Bruce P. Keller *(pro hac vice)*
    Michael Schaper *(pro hac vice)*
    DEBEVOISE & PLIMPTON LLP
    919 Third Avenue
    New York, NY 10022
    (212) 909-6000

    *Counsel for Defendant National Football League*

| Evidence Plaintiffs Cite | Subject Addressed | Connection To Challenged Programs |
|---|---|---|
| Internal NFL emails (Pls.' Opp. 4, 7, and 25, Dkt. 551.) | NFL's policy not to license footage showing illegal hits to third parties. | **None** |
| Driber Deposition (Opp. 8.) | Discussion surrounding third-party licensing of Lawrence Taylor footage. | **None** |
| Sponaugle Deposition (Opp. 8.) | Third parties must obtain licenses to use footage. | **None** |
| Washington Post Article, June 29, 2007 (Opp. 8.) | Restrictions on current-season footage licensed to third-party websites. | **None** |
| NFL Films Licensing Department Memo (Opp. 14.) | Policies on licensing footage to teams. | **None** |
| Sponaugle, Endres, and Driber Depositions (Opp. 25.) | Policies on licensing footage to third parties and teams. | **None** |
| NFL Films Rate Card (Opp. 29.) | Rates for licensing footage. | **None** |
| NFL Email to Deacon Jones (Opp. 29.) | Use of footage in IBM spot. | **None** |
| NFL/Bridgestone Emails (Opp. 39.) | Bridgestone's use of footage. | **None** |
| Endres Deposition (Opp. 40.) | NFL does not own player publicity rights for third-party, commercial endorsements. | **None** |
| Footage Licenses (Opp. 40.) | Third-party footage licenses do not convey player publicity rights. | **None** |

**APPENDIX B**

| Specific Programs Plaintiffs Cite | Proposition Plaintiffs Seek To Establish | Effect On This Motion |
|---|---|---|
| NFL Films Presents 2005 Show #23 "Football Lifers" (Opp. 26.) | "NFL" appears in title. | **None** |
| NFL Network Presents 2004 "Viking Night" (Opp. 26.) | "NFL" appears in title. | **None** |
| Minnesota Vikings Purple Power Years (Pl. Mem. 7) | NFL logo appears in program. | **None** |